**MATHESON v. HICKS, Alien Property Custodian.**

**HICKS, Alien Property Custodian, v. SHAW.**

(District Court, E. D. New York. January 7, 1926.)

**1. War ⊂⟐12—Demand by Alien Property Custodian, served after formal termination of war, held ineffective.**

Demand for property by Alien Property Custodian, served after formal termination of war with Germany on July 2, 1921, was ineffective.

**2. War ⊂⟐12—Evidence held to show that sale of stock in New York corporation by German corporation was bona fide, entitling transferee to possession from Alien Property Custodian.**

Evidence *held* to show that sale by German corporation of stock in New York corporation to American citizens managing it was bona fide, to comply with Sherman Anti-Trust Act (Comp. St. § 8820 et seq.), entitling transferees to possession from Alien Property Custodian, under Trading with the Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e).

**3. War ⊂⟐12—That German corporation, transferring stock in New York corporation, received option to repurchase, held not to show that it retained beneficial interest therein.**

That German corporation, which sold stock in New York corporation to managing officers of New York corporation, was given option to repurchase all the stock of New York corporation, *held* not to show that it retained beneficial interest in New York corporation or its stock, or lien thereon, subject to seizure by Alien Property Custodian.

**4. War ⊂⟐12—German corporation's rights under option to purchase stock in New York corporation held terminated on entry of United States into war.**

Where German corporation sold stock in New York corporation to American citizens, receiving option to repurchase such stock, its rights thereunder, including transferee's obligation to sell stock only to Germans, were terminated under Trading with the Enemy Act, §§ 2, 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½aa, 3115½b), on entry of United States into the war.

**5. War ⊂⟐12—German corporation held not entitled, under option to purchase stock in New York corporation, to benefit of labor and skill of American owners in making corporation successful.**

Even if German corporation's options to purchase stock of American corporation were not terminated by the war, under Trading with the Enemy Act, §§ 2, 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½aa, 3115½b), equity would not compel American owners of stock to give to German corporation benefit of their labor and skill in making American corporation successful without aid of German corporation during war, or entitle Alien Property

Custodian to seize as enemy property the proceeds thereof.

In Equity. Separate suits by William J. Matheson against Frederick C. Hicks, as Alien Property Custodian, and by Frederick C. Hicks, as Alien Property Custodian, against Robert A. Shaw. Decree for plaintiff Matheson in first suit, and for defendant Shaw in second suit.

Winthrop & Stimson, of New York City (Henry L. Stimson, Allen T. Klots, and Fred. B. Lund, Jr., all of New York City, of counsel), for Matheson, Shaw, and others.

Ralph C. Greene, U. S. Atty., of Brooklyn, N. Y. (Guy O. Walser, Asst. U. S. Atty., Henry S. Hooker, and Raymond D. Thurber, all of New York City, of counsel), for Alien Property Custodian.

CAMPBELL, District Judge. The above suits were consolidated by order of this court.

The first above-entitled action is brought in equity by Mr. Matheson, under section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), to compel the return to the plaintiff of certain stock of the Cassella Color Company, a New York corporation, which the Custodian had seized. The Custodian asserts title to the stock, and by way of counterclaim demands an accounting with reference thereto.

The second above-entitled action is brought in equity by the Custodian against Mr. Shaw, for an accounting with reference to an alleged additional interest in the stock of the Cassella Color Company. The defendant Shaw claims to own this stock and demands its return.

The demands by the Custodian were served, the first two on the Cassella Color Company and Matheson and Shaw, and the third on Matheson and Shaw. The first, signed by Custodian A. Mitchell Palmer, dated March 11, 1919, seized 57 per cent. of the total capital stock of said Cassella Color Company standing in the names of said Matheson and Shaw, claiming they belonged to and were held by said Matheson and Shaw on account of, on behalf of, or for the benefit of Cassella & Co. G. m. b. H., of Frankfort on Main, Germany, a German corporation, and required the assignment thereof to him and the issuance of new certificates therefor to him.

The second, signed by Custodian Francis P. Garvan, dated May 14, 1919, stated to be supplementary to any prior demands, seized 855 shares of the capital stock of the said Cassella Color Company out of 1,500 issued

and outstanding on January 2, 1912, purported to have been transferred at a later date by Cassella & Co. G. m. b. H., to Matheson and Shaw as are still outstanding, and the avails of such 855 shares as were no longer outstanding, with interest on said avails, and the accretions and accumulations thereto and the interest on said accretions and accumulations, and required delivery and an accounting.

[1] The third, signed by Custodian Thomas W. Miller, dated November 8, 1921, which was stated to be supplementary to former demands, was much more elaborate; but, inasmuch as this demand was served after the formal termination of the war with Germany, on July 2, 1921 (42 Stat. 105), it was ineffective. Miller v. Rouse (D. C.) 276 F. 715.

Beginning in May, 1918, by three successive reductions, ending in January, 1919, the capital stock of the Cassella Color Company was reduced to 5 shares, and those were the only shares of that company outstanding at the time of such demands. A certificate for 57 per cent. of said 5 shares, or for 2.85, was issued in the name of Francis P. Garvan, as Alien Property Custodian, and of these 2.85 shares Matheson claims $2^{47333}/100000$ and Shaw $^{37667}/100000$.

The real question at issue in this consolidated action is whether the sale of shares of the stock of the Cassella Color Company, made by Leopold Cassella & Co. G. m. b. H., a German corporation, and Carl von Weinberg, a German citizen, to William J. Matheson, in October, 1913, was bona fide and effective, or was colorable and fictitious, and by said sale a German beneficial interest was not extinguished, but was in existence at the time of such demands. In order to properly answer this question it will be necessary to consider the relations and actions of the parties prior to and subsequent to the sale, the surrounding circumstances, the sale and agreements, and in so doing to consider oral and documentary evidence.

[2] The following facts clearly appear from the evidence:

Messrs. Matheson and Shaw are native-born American citizens. Mr. Shaw, the defendant in the first above-entitled action, as a boy entered in the employ of Mr. Matheson, the plaintiff in the first above-entitled action, and gradually rose to a position of importance, eventually becoming a part owner of the business. Mr. Matheson, the plaintiff in the first above-entitled action, is a chemist by education, having studied at St. Andrews University, Scotland, after which he returned to the United States and became expert in the application of coal tar and aniline dyes, and developed a large clientèle of users of dyes.

Having been requested to undertake the distribution of the dyes manufactured by Leopold Cassella & Co., a German partnership, on commission, he refused, because he contended that what he sold to his customers was not only the goods, but also services, as much as the goods themselves, and that he did not regard commissions as suitable compensation. Thereafter the agreement of December 22, 1877, between Leopold Cassella & Co. and William J. Matheson, was entered into. This agreement gave Mr. Matheson the exclusive right to sell aniline color manufactured by Leopold Cassella & Co. in the Middle, Eastern, and Southern States of the United States, subject to the rights of said company to sell to certain specified persons.

Thereafter Mr. Matheson formed a copartnership under the name of William J. Matheson & Co., and on September 5, 1878, an agreement was made by Leopold Cassella & Co. with said copartnership William J. Matheson & Co. This agreement gave the said William J. Matheson & Co. the exclusive right to sell aniline colors manufactured by Leopold Cassella & Co. in the United States of America, subject to the right of Leopold Cassella & Co. to sell to certain specified persons.

On April 27, 1883, an agreement was entered into between Leopold Cassella & Co. and William J. Matheson & Co. This agreement contained provisions for purchases which were for immediate sale, and others which were for stock, and also provided that said Leopold Cassella & Co. should have the right to cancel or continue the contract within 60 days after the event of the death of Mr. Matheson. On January 1, 1894, an agreement was entered into between Leopold Cassella & Co. and Wm. J. Matheson & Co., Limited, which had lately been incorporated. There was no provision in this agreement for a cancellation on the death of Mr. Matheson.

On October 30, 1897, an agreement was entered into between Leopold Cassella & Co. and William J. Matheson & Co., Limited. This agreement contained a provision giving Leopold Cassella & Co. the option to purchase at the end of five years from date, or any time thereafter, or on the death or retirement from business of William J. Matheson, the good will and facilities of all of the

business of William J. Matheson & Co., Limited, in coal tar dyes.

The said agreement also contained a provision that William J. Matheson & Co., Limited, invoice all products of Leopold Cassella & Co., and label all their goods on stationery which should have printed thereon the words "Cassella Color Department," or other words indicating such separate department, as might be mutually agreeable. Mr. Matheson had succeeded, first individually, then through a copartnership, William J. Matheson & Co., and later through the corporation of Wm. J. Matheson & Co., Limited, in building up a large and lucrative business, in which service and advice rendered and given to their customers had come to form a large part in the sale of such dyes.

Mr. Matheson, whether individually or through the copartnership or corporation, had always been conducting a business in which Leopold Cassella & Co. were not the owners of any right, title, or interest in the business or its good will; in fact, their only right with reference to such business was to exercise the option and the rights of a creditor under the agreement for the sale of the merchandise. Mr. Matheson and his copartnership and corporation had also built up a large business in other lines, having even manufactured aniline dyes to compete with the Germans and keep down their prices. The wisdom of separating their business of dealing in the German dyes from the other lines was recognized by Mr. Matheson.

On October 25, 1901, an agreement was entered into between Leopold Cassella & Co. and Wm. J. Matheson & Co., Limited, and William J. Matheson, personally. By this agreement Leopold Cassella & Co. gave to Wm. J. Matheson & Co., Limited, the exclusive right to sell their goods in the United States and Canada, and agreed to deliver goods at prices agreed upon from time to time.

There had been trouble continually about the fixing of prices under the former agreement, and Mr. Matheson had developed a new method of purchasing and selling with reference to prices. The other provisions of the agreement do not greatly differ from the former agreement, except that in the fourth paragraph it provides that Wm. J. Matheson & Co., Limited, agreed to organize a corporation, to be known as the Cassella Color Company, for the purpose of carrying on the business intrusted to the party of the second part under this contract.

The corporation was to have a capital of $250,000 (afterwards reduced to $150,000),

and Leopold Cassella & Co. were to have the right to subscribe for 51 per cent. of the capital stock at par. The contract was to be assigned to such corporation when organized. Mr. Matheson agreed to hold three-quarters of the shares not held by Leopold Cassella & Co., not to engage in a competitive business, and to devote the same time and attention to the business of the Cassella Color Company, as he had done under the preceding contract.

Generally speaking, subject to the provision that Leopold Cassella & Co. were to have the right to subscribe for at least 51 per cent. of the capital stock of the said Cassella Color Company, which was to be distributed in the proportion which the profits made by Leopold Cassella & Co. in manufacturing and selling the dyes to Mr. Matheson and his corporation bore to the profits of Mr. Matheson and his corporation in selling the goods in America, and in addition Mr. Matheson was to receive from Leopold Cassella & Co., in consideration of giving his services as general manager of said Cassella Color Company, without other consideration than his profits by reason of his holding of shares, a percentage of their net profits on business done with the Cassella Color Company equal to the shares held by him in said company.

The agreement further provided that the shares in said Cassella Color Company allotted to Wm. J. Matheson & Co., Limited, should, on the death or retirement from business of said William J. Matheson, be transferred and sold to Leopold Cassella & Co. at its par value plus any undivided profits at any time after two years from the beginning of the contract, and that, on the death or resignation from the employment of the said Cassella Color Company of any of the American shareholders, his shares should be transferred and sold at their par value plus any undivided profits to William J. Matheson, and that he shall take them.

The corporation, Cassella Color Company, was organized and the stock distributed according to the percentage of profits, which had been ascertained as follows: 56.51075 shares to Leopold Cassella & Co., and 43.-48925 shares to Mr. Matheson and his associates—and Leopold Cassella & Co. contracted to give Mr. Matheson 43.48925 per cent. of the profits they made in the manufacture of the goods and their sale to the Cassella Color Company. The Cassella Color Company then took up the sale of the colors manufactured by Leopold Cassella & Co. G. m. b. H.

On December 31, 1901, an agreement was

entered into between Leopold Cassella & Co., Wm. J. Matheson & Co., Limited, and William J. Matheson, which among other things provided for subscriptions to capital of Cassella Color Company, as follows: Wm. J. Matheson & Co., Limited, 1,108 shares on behalf of American stockholders, Leopold Cassella & Co., 1,387 shares, and Carl von Weinberg, 5 shares. As to its other provisions, this agreement was superseded by the agreement of April 30, 1903.

These agreements produced no change, but in the 1903 agreement Mr. Matheson agreed upon the termination of the contract, or any extension thereof, or in the event of his death or voluntary retirement from business after the 31st of December, 1903, all shares of said corporation allotted to the American shareholders should be transferred and sold to Leopold Cassella & Co. at the par value plus any undivided profits thereon, and William J. Matheson acknowledged that he held the entire share capital of said corporation issued to the American shareholders in trust for the performance of the agreement.

On October 29, 1907, an agreement was entered into between Leopold Cassella & Co. G. m. b. H. (the German corporation which had succeeded the firm of Leopold Cassella & Co.) and William J. Matheson personally, which released him from his duties as general manager upon the appointment of his successor or successors, and provided that he should continue in an advisory capacity.

On October 21, 1911, an agreement was entered into between Leopold Cassella & Co. G. m. b. H., Cassella Color Company, and William J. Matheson, which provided that the agreement of April 30, 1903, which would expire at the end of 1911, should be continued for the further period of three years, and that the compensation of said William J. Matheson should be one-half that named in said agreements, and theretofore received by said William J. Matheson, and one-half of the stock of the Cassella Color Company held by him should be assigned to Leopold Cassella & Co. G. m. b. H., as provided in the agreement of April 30, 1903.

On December 15, 1911, the state and federal corporation taxes having proved annoying, Mr. Matheson wrote to Mr. von Weinberg, proposing, as a solution of the difficulty, that a general partnership be formed, consisting of Leopold Cassella & Co. G. m. b. H., Mr. Matheson, and Mr. Shaw, and suggesting that the partnership could stipulate that the good will on dissolution could go to Leopold Cassella & Co. G. m. b. H. This proposition was never accepted.

On the formation of the Cassella Color Company, Mr. von Weinberg became president, Mr. Matheson vice president, and Mr. Shaw secretary, and those three constituted the board of directors. Mr. von Weinberg never directed the affairs of the corporation, or attended the meetings of the directors, nor did he, in fact, ever come to America during these years, save on one occasion, when he came for a few weeks on a social visit.

Mr. Matheson, after the formation of the company, continued, as he had done before, to manage and control the sale of dyes. He directed all the policies of the company and fixed the selling prices in America. Mr. Matheson began in 1908 to gradually retire from business, and in 1912 resigned as general manager.

Mr. Shaw was selected as his successor, and, as the agreements hereinbefore referred to show, one-half of the American-held shares, approximately 22 per cent., were sold to Leopold Cassella & Co. G. m. b. H., and the share of profits of the German company payable to Mr. Matheson was similarly reduced to approximately 22 per cent. Mr. Shaw, with the other American officers and directors, continued to manage and control the company, with Mr. Matheson acting in an advisory capacity.

In the year 1913 there were a number of other German dye manufacturers who were distributing their goods in the United States, and they, with Leopold Cassella & Co. G. m. b. H., were members of a combination or cartel.

Several suits were commenced by customers against the Cassella Color Company in the spring of that year to recover triple damages, on the theory that the Cassella Color Company was controlled by said Leopold Cassella & Co. G. m. b. H., and that said combination was in violation of the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.). Similar suits were at the same time brought against other distributors of German dyes.

Certain trade abuses existed in the dyestuff trade, and they had become acute at this time. It thus became apparent that something must be done to remedy these conditions. On the advice of the American counsel for the company, it appeared that, to avoid future danger of attack under the Sherman Anti-Trust Act, the company must sever itself from control by the German house, and the Americans who comprised the

staff of the Cassella Color Company desired and requested Mr. Matheson to return to active leadership in the company.

Mr. Matheson had been on a long trip abroad, and on his return agreed to resume the presidency of the company, but only on the condition that all the stock of the company owned by the Germans should be purchased and the control of the German interests severed. To accomplish this result, and also to procure a new contract, Mr. Shaw went to Germany in the fall of 1913.

The plan was to have the stock of the company owned by, and the corporation controlled entirely by, Americans, thus relieving it from any German control. A contract with Leopold Cassella & Co. G. m. b. H. was necessary, if the business, which was lucrative, was to continue.

The profits received while Mr. Matheson was formerly at the head of the company were satisfactory, and therefore the agreement by its terms provided that Leopold Cassella & Co. G. m. b. H. were to be paid in such a manner that they would receive the same aggregate remuneration for their goods as they received before Mr. Matheson resigned in 1912 as general manager. The plan was to have such remuneration paid by contract as the price of the goods manufactured and sold by them to the Cassella Color Company, and not because of any interest in said company.

Mr. Shaw spent considerable time in Germany, endeavoring to induce Mr. Carl von Weinberg, the managing director of Leopold Cassella & Co. G. m. b. H., to sell the German-owned stock. Mr. von Weinberg at first refused to sell the stock, and was supported in his refusal by his attorney in Germany. Mr. Shaw continued his efforts because he realized, what the Germans did not, namely, the dangers of violating the Sherman Anti-Trust Act.

Mr. von Weinberg proposed several schemes by which the stock would be trusteed and the German beneficial interest retained. Mr. Shaw was during all this time in communication by cable with Mr. Matheson, who was in the United States, and communicated the several proposals of Mr. von Weinberg to Mr. Matheson, by whom they were rejected.

Finally, on October 25, 1913, the sales contract between Leopold Cassella & Co. G. m. b. H. and the Cassella Color Company was executed, and Mr. von Weinberg consented to sell on condition that Mr. Shaw give him a letter agreeing that all the stock of the Cassella Color Company would be sold back to him at any time after December 31, 1914, on the payment of par value plus undivided profits. The letter was given on the same day, and the assignments of the stock held by them were executed by Mr. von Weinberg and Leopold Cassella & Co. G. m. b. H. on November 6, 1913.

Mr. Matheson paid in cash at par for said stock $117,383.06, by check to the agents of the sellers, dated October 29, 1913, drawn on a New York bank. The stock was duly transferred on the books of the company, and new certificates issued to Messrs. Matheson and Shaw.

After that time no German ever held office in the Cassella Color Company, and no dividends were paid to any Germans, or any persons other than the stockholders of record of the company, and such stockholders retained for their own use such dividends paid to them, and there was no change in the ownership of the stock until the Alien Property Custodian made the seizure and obtained the certificate for 2.85 shares, except that the number of outstanding shares had through the process of liquidation by the reduction of the capital stock, been reduced from 1,500 shares to 5 shares.

Difficulties arose in the invoicing of goods, under the contract of October 25, 1913, at cost instead of at market value, due to the customs regulations, and therefore a new contract was entered into between Leopold Cassella & Co. G. m. b. H. and Cassella Color Company, on April 1, 1914. The stock ownership was in no way affected by this contract, but under its provisions the title to dyes purchased passed at Frankfort, instead of at New York, the dyes were invoiced at market value, instead of at cost, and the percentage to be paid to the Germans as additional compensation was fixed at 57 per cent., instead of at 56.51075 per cent.

The agreement was to be in force until December 31, 1914, and from year to year thereafter unless terminated on December 31, 1914, or at the end of any succeeding year, by written notice from either party to the other, six months prior to such termination.

Under the clause of the contract of April 1, 1914, Mr. von Weinberg wrote the Cassella Color Company, notifying it of his intention to terminate such contract on December 31, 1914, because he was seriously thinking of exercising his option to purchase the stock after that date. The European war broke out in August, 1914, and, nothing further having been heard from Mr. von Weinberg, on November 6, 1914, Mr. Matheson wrote him to ascertain his wishes with

reference to canceling the contract with the Cassella Color Company and acquiring the stock of that company. On November 20, 1914, Leopold Cassella & Co. wrote the Cassella Color Company, withdrawing the notice, expressing the desire that the contract remain in force for 1915.

Great difficulty was experienced by the Cassella Color Company in obtaining dyes from Leopold Cassella & Co. after the outbreak of the war. The shipments were gradually cut off, and communication with Germany ultimately almost ceased. In the hope of a speedy ending of the war, and the resumption of business relations and receipt of dyes as formerly, Messrs. Matheson and Shaw put forth their best efforts to maintain the Cassella Color Company as a going concern and to preserve its organization.

As a means of accomplishing such purposes, Messrs. Matheson and Shaw, by letter and cable, repeatedly endeavored to induce Leopold Cassella & Co. G. m. b. H. to establish the manufacture of dyes in the United States, but without success. As long as it was possible with the colors on hand, the Cassella Color Company continued purchasing such dyes as they could and mixing with them a portion of the German dyes; but as it appeared to be impossible to obtain the German dyes to continue with this plan, Messrs. Matheson and Shaw, in November, 1915, organized the Century Colors Corporation, with a capital of $500, which was provided by Mr. Shaw.

Having found a man with some experience, the corporation commenced the manufacture of dyes in a small plant at Nutley, N. J., the intermediates being supplied by the General Chemical Company. The corporation made a few colors in limited quantities, all of which were sold to and distributed by the Cassella Color Company.

A running account was kept between the two companies, and from time to time advances were made to the Century Colors Corporation by the Cassella Color Company until the amount due from the Century Colors Corporation to the Cassella Color Company, on August 31, 1917, was $111,354.52, exclusive of $62,685.43 of accounts receivable of the Cassella Color Company, which were on that date transferred to the Century Colors Corporation. No interest was paid on these advances, which were all charged to the Century Colors Corporation and never carried as an expense of the Cassella Color Company, and did not affect the profits which the Germans were entitled to under their contract of April 1, 1914. The said advances were repaid to the Cassella Color Company in full by the Century Colors Corporation.

The gross business of the Century Colors Corporation, from the time of its organization until its stock was sold to the National Aniline & Chemical Co., Inc., on September 11, 1917, did not exceed $50,000, and its operation resulted in a deficit which was paid by Messrs. Matheson and Shaw. All possibility of procuring further dyes from Germany ended when the United States entered the war. The stock on hand was small, and all that the Cassella Color Company could hope to obtain for sale was the small quantity that the Century Colors Corporation was able to turn out and such purchases as could be made in this country.

The company had a large staff of salesmen, who under their contracts with the company were entitled to fixed, stated salaries, with commissions in addition, and was also obligated on leases of offices in different localities. These expenses could not be paid from any revenue then in sight, and even the small revenue which might be received from the sale of the dyes manufactured by the Century Colors Corporation was in danger of being cut off, as the General Chemical Company was threatening to discontinue supplying that company with intermediates, and if that threat had been carried into effect the Century Colors Corporation would have been compelled to cease operations.

The necessities of this country required the establishment of a dye industry here of sufficient strength and importance to meet the country's needs, and this a group of manufacturers, with Dr. W. H. Nichols, of the General Chemical Company, were trying to accomplish. Dr. Nichols desired to secure the services of Mr. Matheson, who was well known to him, and who had been a director of the General Chemical Company for some years, and whose services he considered indispensable.

An invitation to join the new National Aniline & Chemical Company, Inc., then in the process of formation, to give their services and to invest their funds in it, was extended to Messrs. Matheson and Shaw, who were also requested to sell to it the shares of stock of the Century Colors Corporation, and to invite the employees of the Cassella Color Company to enter its services. Messrs. Matheson and Shaw were doubtful of the success of the new company, and did not desire to do anything which would inter-

fere with their resumption of business relations with Leopold Cassella & Co. G. m. b. H. after the termination of the war.

Their proposition, among other things, to maintain a separate selling organization, which would sell the products of the National Aniline & Chemical Company, Inc., dyes during the war, and after the war would be free also to sell the German dyes, was not acceptable to the organizers of the new company, and finally Messrs. Matheson and Shaw joined the organization of the new company. The authorized capital stock of the Century Colors Corporation was increased from $500 to $200,000, and Messrs. Matheson and Shaw subscribed for all of the additional stock, for which they paid in full in cash, and also paid the deficit of said corporation of over $10,000.

The business of the Cassella Color Company was terminated as of August 31, 1917, and the Century Colors Corporation paid in full to the Cassella Color Company all its indebtedness. The tangible assets of the Cassella Color Company were sold to the Century Colors Corporation for $153,393.88, which was paid in cash. The leases held by the Cassella Color Company were assigned to the Century Colors Corporation and assumed by it. The intangible assets of the Cassella Color Company, including the name, were not sold.

The moneys standing to the credit of Leopold Cassella & Co. G. m. b. H. on the books of the Cassella Color Company, amounting to $211,544.34, were paid over to the Alien Property Custodian. Messrs. Matheson and Shaw entered into a contract with the National Aniline & Chemical Company, Inc., whereby they contributed all the stock of the Century Colors Corporation, $200,000, in cash, partly furnished by them and partly by their American associates, and an agreement that Messrs. Matheson and Shaw's services should be at the National's disposal, and that they would not engage in any dye business for five years, and the National Aniline & Chemical Company, Inc., issued to them and their American associates 4,000 shares of the preferred stock and 40,000 shares of the common stock of the National Aniline & Chemical Company, Inc.

Mr. Matheson was made president and chairman of the board of directors of the National Aniline & Chemical Company, Inc., and Mr. Shaw was made vice president. The National Aniline & Chemical Company, Inc., was successful, not only in producing dyes, but also aniline oil, an essential in the man-

ufacture of smokeless powder, and in addition erected and operated a plant for the manufacture of mustard gas.

Beginning in May, 1918, about eight months after the sale of the capital stock of the Century Colors Corporation to the National Aniline & Chemical Company, Inc., the liquidation of the Cassella Color Company was commenced and by three successive reductions (the last being on January 21, 1919) the 1,500 shares of the said company were reduced to 5 shares. On each reduction Messrs. Matheson and Shaw received $100 per share for each share turned in. Of the 5 outstanding shares, 57 per cent., or 2.85 shares, were seized by the Alien Property Custodian. Of the shares so seized $2^{47333}/_{100000}$ shares were seized from Mr. Matheson and $^{37667}/_{100000}$ of a share from Mr. Shaw.

In the face of the foregoing facts, the Alien Property Custodian contends that, notwithstanding the transfer in October, 1913, of the shares of the capital stock of the Cassella Color Company held by the Germans to Mr. Matheson, and the holding from that time of all the shares of stock in that company by Americans, the Germans still retained a beneficial interest, other than the rights given by the contracts of 1913 and 1914, and the option to purchase all the shares. This contention of the Custodian, it appears to me, is founded in part, at least, on a misconception of the difference in the relations which existed between Leopold Cassella & Co. and Mr. Matheson, before the purchase of the shares held by that company in the Cassella Color Company.

There were six large dye manufacturers in Germany, generally known in America by the short names of the Badische Company, the Bayer Company, the Berlin Company, the Kalle Company, the Hoechst Company, and the Leopold Cassella Company, who had been selling dyes in America for many years. The Bayer, Badische, Berlin, and Kalle Companies were represented by Germans, and generally the companies were operating through their own representatives; the American house being but a department of the business.

This had never been the condition with Mr. Matheson, who had individually, by partnership and corporation, conducted an independent business; but the relations of the Cassella Color Company to Leopold Cassella & Co. G. m. b. H., with Mr. von Weinberg as president and 78 per cent. of the stock held by the Germans, had become much closer,

and it was to completely change this situation, and eliminate the German interest and control, that Mr. Matheson, in 1913, insisted that all the shares held by the Germans should be sold to him, and that all the capital stock of the company should be held by Americans.

This determination was not based in the slightest degree on the prospect or existence of the war, nor is there any evidence to show that the war was even in contemplation of any of the parties at that time. This, it seems to me, clearly distinguishes the instant suit from Hodgskin v. United States (C. C. A.) 279 F. 85.

The fact that the German companies had formed a cartel in Germany had furnished a ground upon which suits had been commenced in this country under the Sherman Anti-Trust Act, against the distributors in this country of such German companies, among whom was the Cassella Color Company. These actions were a real danger to the Cassella Color Company, but their importance was not realized by the Germans, as appears from the expressed intention of Leopold Cassella & Co. G. m. b. H. to send Mr. Selck to this country, against which the counsel for the Cassella Color Company advised.

The Cassella Color Company retained the best counsel obtainable, and its officers were advised by them that, if they were to continue free from any future actions based on said act, they must be freed from German interest and control. It was a fact that the actual control of the company was then in American hands, but, with 78 per cent. of the stock owned by the Germans, the control exercised by the Americans was of necessity at the will of the German interest.

Not only was the business endangered by the actions then pending, but certain trade abuses were likewise injuring the business, and it was even believed that resentment because of such abuses had caused the bringing of such actions. Mr. Matheson had been an opponent of such abuses, and had the confidence of those to whom the dyes were generally sold. He had retired to a large extent from business, and had been on a long vacation trip; but his American associates believed that with him at the head the business could be brought to a stable and prosperous condition, and urged him to resume his headship of the business.

This he agreed to do, but only on the condition that all the capital stock of the Cassella Color Company should be held by Americans and the company should be an American company. In making the condition of his return to the headship and control of the company that the company should be owned entirely and controlled by Americans, I am convinced Mr. Matheson did that in order to obey, and not to evade, the Sherman Anti-Trust Act.

The sweeping condemnation of Messrs. Matheson and Shaw, contained in the brief of the Custodian's counsel, is not, in my opinion, warranted by the evidence. Reputations gained in years of activity as honorable business men, and the valuable services which they rendered to this country during the war, lead me to the belief that they have not deliberately falsified in this case, and, if there be some inconsistencies, we must not lose sight of the fact that the original documents were in the possession of the Custodian from 1919 until January, 1924, when Messrs. Matheson and Shaw had access to them for the first time in nearly five years.

The predating by Mr. Shaw of the minutes of the meeting of the board of directors of the Cassella Color Company, at which Mr. Matheson was elected president, was not proper; but it does not impress me in any way as proving or tending to prove that the sale of the stock held by the Germans was other than a bona fide sale. In addition to acquiring the shares of the capital stock held by the Germans, it was also necessary, because of the difficulties in complying with the customs laws under the old contract, to secure a new contract along the lines advised by counsel, a form of which they had prepared.

With these objects in view, Mr. Shaw went to Germany in the fall of 1913. Mr. von Weinberg, acting for himself and Leopold Cassella & Co. G. m. b. H., did not desire to sell the stock they held in the Cassella Color Company, and was supported in that position by his counsel.

Many conferences were held, and Mr. von Weinberg offered counter propositions; but, although Mr. Shaw endeavored to keep the negotiations open and reported all propositions to Mr. Matheson by cable, Mr. Matheson continued firm in his position that the stock must be sold to him and the corporation be made wholly American. To this Mr. von Weinberg, on October 25, 1913, finally agreed, upon condition that Mr. Shaw in writing promise, on behalf of Mr. Matheson, that Mr. von Weinberg should have the option to purchase, not only the shares which were then sold to Mr. Matheson, but all the

shares of the Cassella Color Company, for par, plus undivided profits.

On behalf of the Custodian it is urged that it is unreasonable to suppose that Mr. von Weinberg would have made an actual bona fide sale for any such price, but I am unable to agree with that contention. Mr. Matheson was a tower of strength at that time, and under the conditions then prevailing in the dye trade in America, his leadership of the company it was hoped would largely increase the sales, and as Leopold Cassella & Co. G. m. b. H., represented by Mr. von Weinberg, was to receive the same proportion of profit by contract, and not through dividends, the sale was advantageous to them. Furthermore, when Mr. Matheson sold approximately 22 per cent. of the capital stock of the Cassella Color Company on his retirement as general manager, that was the sum he received.

[3] The Custodian further contends that, because the option to purchase all the capital stock was given to Mr. von Weinberg and his company, under the conditions named, that shows that he and his company retained an interest in the corporation, and that such sale was merely colorable; but I am unable to agree with that contention, because the dye business had not developed in America at that time, and Mr. Matheson would not have cared to continue the Cassella Color Company, if the contract with Leopold Cassella & Co. G. m. b. H. had been canceled, and therefore he undoubtedly would have been glad to receive back his money in the event of such cancellation, while Leopold Cassella & Co. G. m. b. H. would have been glad to pay the price provided, and take over the company, whenever they felt they could do it with profit to themselves.

In considering these transactions, it must be borne in mind that the members of the former partnership of Leopold Cassella & Co., which was succeeded by the corporation of that name, with whom Mr. Matheson had dealt for years, were no longer in control of the company, and his relations with the new people were not the same; therefore he desired a more complete control. But the contract was a very valuable one, and he was willing to make any reasonable concessions with reference to a sale of the business at its termination rather than to lose the contract.

The testimony given both by Mr. von Weinberg and his attorney, Mr. Selck, which was taken by letters rogatory, convinces me that the transfer of the stock was bona fide, and not colorable. Especially does this appear from Mr. Selck's testimony, who objected to the sale, advised against it, and when his advice was declined said he was told by Mr. von Weinberg "he had taken into consideration my advice by having obtained an option to reacquire the shares." This is further borne out by Mr. von Weinberg's letter to Mr. Matheson, dated December 17, 1913, and Mr. Matheson's reply, and the letter of Leopold Cassella & Co. G. m. b. H. to the Cassella Color Company, dated June 18, 1914, in which he gives notice that they will exercise the option to purchase at the end of 1914.

That Leopold Cassella & Co. G. m. b. H. and Mr. von Weinberg had no equitable interest in the Cassella Color Company, and that the only right they possessed with reference to any right, title, or interest in it was an option of October 25, 1913, to purchase its stock, clearly appears from the letter of C. von Weinberg to Mr. Shaw, dated July 17, 1914; and, whatever may have been Mr. Shaw's reason for desiring "to make our records in harmony in case of examination," it does not show that either Leopold Cassella & Co. G. m. b. H. or Mr. von Weinberg had any reserved interest in the Cassella Color Company.

That Mr. Shaw may have considered the option unimportant, as he stated in the slip attached to his letter to Mr. von Weinberg, dated July 3, 1914, does not seem strange, when you consider what would have been the effect of canceling the contract; and that Mr. von Weinberg may have considered the option of great importance, as expressed in his said letter of July 17, 1914, seems perfectly natural, as that represented the only right which he and his company had with reference to the Cassella Color Company, other than that of a creditor under the contract for the sale of merchandise.

After the outbreak of the war, Leopold Cassella & Co. G. m. b. H. notified the Cassella Color Company that they must consign the shipments for that company to an American citizen, and the correspondence between the companies shows clearly that the Cassella Color Company claimed to be an American corporation, and that all its shares were owned by resident Americans, to which claim Leopold Cassella & Co. G. m. b. H. assented.

The Custodian also contends that the correspondence between Matheson and Shaw, in 1916 and 1917, and their negotiations with the National Aniline & Chemical Company, Inc., show the existence of an outstanding

beneficial German interest; but that is not the impression I gather from that correspondence. My understanding of the correspondence and the negotiations is that both Matheson and Shaw looked for a speedy termination of the war, and the possibility of a renewal of relations with the German company, and the opportunity to again do a profitable business, which, in addition to a desire to be fair to those with whom they had long dealt, moved them to do nothing which would make such renewal of relations impossible. They also lacked confidence in the ability of the proposed company to compete with the German manufacturer after the war.

Their whole course of conduct in the management of the Cassella Color Company, after it became impossible to obtain dyes from Germany, showed a scrupulous desire to act, not only fairly, but generously, with the German company. When America entered the war, the situation changed. The Cassella Color Company could no longer continue to carry on business, as it had but a small stock of dyes on hand, and the Century Colors Corporation, on which it had been depending, was in a position when on any day it might be unable to supply any dyes.

The overhead of the Cassella Color Company, including the salaries payable to salesmen under contract and the rent reserved in leases on offices in various cities, could not be met from the earnings, and it was then that Messrs. Matheson and Shaw sold the tangible assets of the Cassella Color Company to the Century Colors Corporation, and then sold the entire capital stock of the Century Colors Corporation to the National Aniline & Chemical Company, Inc., and with their associates paid in $200,000 in cash, receiving the preferred and common stock of the said company as hereinbefore set forth.

By the sale to the Century Colors Corporation, the Cassella Color Company was relieved of the payment of such rent and wages which were assumed by the Century, most of the sales force going to the National. Even when disposing of the tangible assets of the Cassella Color Company, Messrs. Matheson and Shaw showed their consideration for the German company by retaining the name "Cassella Color Company"; but this did not prove any German ownership or interest, but merely a desire to be fair to a company with which they had long dealt, especially when that company was not in a position to help itself.

The fact that there was no substantial difference in the percentage of profits which

the Germans received after the sale of the stock to Mr. Matheson in 1913, and what they had received when he was formerly at the head of the company, does not prove that the Germans had any beneficial interest in the Cassella Color Company, but simply that they were able to make terms that were satisfactory to them for the sale of their merchandise, and that without a contract for the sale of their merchandise the shares of stock of the Cassella Color Company would not have been a desirable investment.

The crediting of Leopold Cassella & Co. G. m. b. H. by the Cassella Color Company with a portion of the profits on the sales, which included domestic dyes bought and sold after the commencement of the war, and before the entry of this country into the war, does not show any interest in that company, but was in accordance with custom, and its omission would certainly have been resented by the Germans, if the war had come to a speedy termination, as was then expected, and, furthermore, it would have been exceedingly difficult, if possible, to have determined just what proportion of the value of the dyes sold was due to the German dyes, which were mixed with the domestic dyes.

The charging of losses to the Germans in the last quarter of 1915 was due to the act of the bookkeeper in making what was a temporary entry in closing the books, awaiting the report from Germany, which never came, and on the receipt of which the final adjustment would have been made, and this to my mind does not show that Leopold Cassella & Co. G. m. b. H. had any beneficial interest in the Cassella Color Company.

The fact that Mr. Shaw, in his letter of October 25, 1913, to Mr. von Weinberg, which contained the option, provided that, in event of the exercise of the option as of December 31, 1914, Mr. Matheson was to continue to receive 25 per cent. of the net profits of the years 1915 and 1916 of the Cassella Color Company, and that he and Mr. Matheson during the years 1915 and 1916 would render the same measure of service as in 1911 and 1912, and as a postscript he said, "The difference of 2 per cent. between payments under the two plans is to cover interest on the investment in the share stock," does not, in my opinion, bear out the contention of the Custodian's counsel that this showed that Leopold Cassella & Co. G. m. b. H. was financing the purchase by Mr. Matheson, because no such payment was to be made if Mr. Matheson retained the stock, but only if the option was exercised, and it appears to me

that this shows that the transaction was bona fide, because it protected Mr. Matheson against the loss he would suffer if the option was exercised at the end of 1914, and that is exactly what any careful business man would require, who was investing over $100,000 in a business, an option to purchase which he was giving.

On the trial of this suit I allowed the greatest latitude in the examination of all matters having any bearing on the business relations between Messrs. Matheson and Shaw, their partnership and corporation, and Leopold Cassella & Co. G. m. b. H., its predecessor copartnership, and Mr. von Weinberg, and the transactions of Matheson and Shaw with reference to the Cassella Color Company, the Century Colors Corporation, and the National Aniline & Chemical Company, Inc., after the outbreak of the war, because the real question at issue was whether the sale of the German-held shares of the Cassella Color Company, transferred to Mr. Matheson, was a bona fide sale or a merely colorable one, and to determine that question it was necessary to consider the motive and intent of Matheson, Shaw, and von Weinberg. Wood v. United States, 16 Pet. 342, 360, 10 L. Ed. 987.

This included the evidence introduced with reference to the assignment of the German patents to the National Aniline & Chemical Company, Inc.; but, whatever may be said with reference to such assignments, I cannot find from such action anything that tends to show the motive and intent of the parties with reference to the transfer of stock, made about four years prior thereto and under conditions that were radically different.

All the parties to these suits have cited Stoehr v. Wallace, 255 U. S. 239, 41 S. Ct. 293, 65 L. Ed. 604, Hodgskin v. United States (C. C. A.) 279 F. 85, and Metz v. Garvan (U. S. D. C., S. D. of N. Y., opinion of Mayer, District Judge, dated June 2, 1921) 3 F.(2d) 182, and as I understand the counsel for the Custodian, these cases have established a new body of law growing out of the late war.

In Stoehr v. Wallace, supra, the transfer was made on February 20, 1917, after the United States had broken off diplomatic relations with Germany. A father and three sons, who were in partnership, organized an American corporation, Stoehr & Sons, Inc. The father and two sons were German subjects; the other son, a naturalized American citizen. All were shareholders of the German corporation, Kammgarnspinnerei Stoehr & Co., Aktiengessellschaft. The stock in the Botany Mills, which was held by two of the brothers in an express trust for the German corporation, was transferred to the American corporation; but, although the stock was transferred on the books of the Botany Mills from the German to the New York corporation, the certificates of stock were left in the custody of the Germans as collateral security. Immediate payment of the purchase price was not provided for, but only an initial payment of $5,000, and even this was not made. The balance of $5,000,000 was to be paid in five annual installments, no one of which was paid, and it was further provided that, if payment was not made when due, nor within 60 days after demand, the shares were to be retransferred, and the $5,000 retained by the Germans. No accruing dividends were paid to the American corporation, but they were credited to it in a special account on the books of the Botany Mills, in pursuance of the direction of Hans E. Stoehr, a German subject, treasurer of the Botany Mills, and president of the American corporation.

This case is clearly distinguishable from the suit at bar, where the transactions antedated the outbreak of the European war by nearly a year, and America's entry into the war by over three years, and the stocks were paid for in full in cash, transferred on the corporation's books, and the certificates held by the American purchasers, who received and retained the dividends, and as to which stocks the only right which the Germans had was an option to purchase, which they never elected to exercise.

In Hodgskin v. United States, supra, a German subject named Simon came to the United States from Germany in 1900, at the instance of a German corporation, and organized an American corporation, for the manufacture of chemicals in America, on the formulæ supplied by the German corporation. He remained in America a German subject, and was a director and treasurer of the company. 745 out of 750 shares of the corporation were owned and held by the German corporation which had furnished all the capital. In April, 1916, in admitted contemplation of the entry of the United States into war, to evade the difficulties that might ensue, the transfer was made to Hodgskin, the attorney for the parties, to protect the interests of his German clients. The money paid by Hodgskin was furnished by Simons' father-in-law, and Hodgskin did not agree to return the money loaned, but the only con-

sideration the father-in-law received was a letter in which Hodgskin stated to the father-in-law that he could take the stock in payment of the loan in case the loan was not paid.

This case is clearly distinguishable from the suit at bar, where the transfer was made only after long negotiation, each party actively seeking its own interest, the money for the purchase furnished by the purchaser, and not by the seller or any one connected with it, and the transfer actually completed long before there was any reason to believe there would even be a war in Europe.

In Metz v. Garvan, supra, the sale was not made in contemplation of war, but was made in 1913, in view of a crisis produced by the Sherman Anti-Trust Act. Metz had developed a business as a distributor in the United States of the dyes and chemicals of a German manufacturer, which owned a majority of the stock in the Metz company. This company was threatened with suit under the Sherman Law, and a sale of the German-owned stock was made to Metz.

This sale was admittedly made for the purpose of avoiding liability under the Sherman Law, and the profits of the company, not only after the sale, but even previous thereto, had been divided without any regard to the stock ownership. The stock was transferred to Metz, and he paid nothing in cash, but merely gave a demand note for $597,000, the certificate of stock being deposited in a bank in Montreal as security for the note, which note provided that, on Metz's failure to pay the same on demand, the German corporation could sell the stock, either at public or private sale, without notice to Metz, and could itself be the purchaser.

This sale was held valid, and surely it was more subject to attack than the sale in the suit at bar, where Mr. Matheson paid in cash for the stock which he purchased, and on which the sellers retained no lien, but simply had an option, which could not be exercised for more than a year, and, if exercised, must be to purchase, not only the stock purchased by Mr. Matheson from the Germans, but all the capital stock of the company, and that at the same price which he paid for the stock he purchased; whereas, in the Metz Case, the Germans could call on Metz at any time to pay in excess of a half a million dollars, and on his failure to pay this large sum, purchase the same at private sale.

There is no finding in the Metz Case of what would have been the effect if an option to repurchase under stated conditions had been given. In my opinion the Metz Case is authority for sustaining the transfer in the suit at bar.

The record evidence of the transfer of the stock to Mr. Matheson and payment therefor is complete, and I can find no evidence which would warrant the finding that either Leopold Cassella & Co. G. m. b. H. or Mr. von Weinberg retained any beneficial interest in the Cassella Color Company, or that Messrs. Matheson or Shaw were trustees for the benefit of said Leopold Cassella & Co. G. m. b. H., or Mr. von Weinberg, by any written, parol, or implied trust, or as trustees ex maleficio, and no such finding can be based on suspicion or inference; on the contrary, the evidence, written and oral, is convincing that the sale of the stock was bona fide, and the only right which Leopold Cassella & Co. G. m. b. H. or Mr. von Weinberg had was the option to purchase.

The option to purchase all of the capital stock of the Cassella Color Company which Mr. von Weinberg received did not give to him or Leopold Cassella & Co. G. m. b. H. any beneficial interest in or lien upon said stock. Richardson v. Hardwick, 106 U. S. 252, 254, 1 S. Ct. 213, 27 L. Ed. 145; Life Preserver Suit Co. v. National Life Preserver Co., 252 F. 139, 164 C. C. A. 251; Provident Life & Trust Co. v. Mills (C. C.) 91 F. 435, 442, 443; Rease v. Kittle, 56 W. Va. 269, 49 S. E. 150; Bostwick v. Hess, 80 Ill. 138. The only right which the Germans had under the option depended upon their election for its exercise, and did not constitute property which the Alien Property Custodian had the right to seize. Stoehr v. Miller (C. C. A.) 296 F. 414.

[4] All the rights of the Germans under the option were terminated, not merely suspended, by the entry of the United States into the war, and this applies both as to the obligation to transfer and deliver the stock to the Germans, on demand, on payment of the price named (Trading with the Enemy Act, 40 Stat. c. 106, § 3 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½b]; also section 2 [section 3115½aa], which defines the meaning of the words "to trade"; The William Bagaley, 5 Wall. 377, 18 L. Ed. 583; Griswold v. Waddington, 16 Johns. [N. Y.] 438; New York Life Ins. Co. v. Statham et al., 93 U. S. 24, 23 L. Ed. 789; Ertel Bieber Co. v. Rio Tinto Co., Limited, [1918] A. C. 260), and also as to the obligation not to sell the stock to any one but the

Germans (Joring v. Harriss [C. C. A.] 292 F. 974; Ertel Bieber Co. v. Rio Tinto Co., Limited, supra; Zinc Corporation v. Hirsch, [1916] 1 K. B. 541; Robson v. Premier Oil & Pipe Line Co., [1915] 2 Ch. 124).

[5] Even if there was any doubt about the options being terminated by the entry of the United States into the war, equity would not compel Messrs. Matheson and Shaw to give the benefit of their labor and skill, and the industry which they developed for the benefit of this country during the war, to the Germans, whose only right was an option to buy the capital stock of a company, which, if continued actively in the dye business and unliquidated during the war, could have had but one end, and that was ruination, and at the expense of Messrs. Matheson and Shaw, and in order to have made a success of the company in any other field would have required energy and skill along lines never contemplated when the option was given, and could not have been in any way contributed to by any act of the Germans, but must have resulted from the energy and skill of Messrs. Matheson and Shaw. Atlantic Steel Co. v. R. O. Campbell Coal Co. (D. C.) 262 F. 555; Allanwilde Corp. v. Vacuum Oil Co., 248 U. S. 377, 39 S. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15; In re Badische Co., Ltd., [1921] 2 Ch. 331; Zinc Corporation v. Hirsch, supra; Distington Hematite Iron Co. v. Possehl & Co., [1916] 1 K. B. 811.

The views already expressed render it unnecessary to consider whether any of the investment of Messrs. Matheson and Shaw in the National Aniline & Chemical Company, Inc., consisted of the avails of liquidation of the stock of the Cassella Color Company or the sale of its assets, because, in my opinion, all the capital stock of the Cassella Color Company was the absolute property of the American stockholders, in which the Germans had no interest, even their option to purchase being terminated by the entry of the United States into the war, and with reference to the capital stock and assets of said company the holders could do as they pleased, except that they were bound to pay, as they did to the Alien Property Custodian, the sum in which the said company was indebted to Leopold Cassella & Co. G. m. b. H. under the contract of April 1, 1914.

A decree may be entered in the first suit in favor of the plaintiff William J. Matheson against the defendant Alien Property Custodian, as prayed for in the bill of complaint, and dismissing the Custodian's counterclaim, with costs and disbursements.

A decree may be entered in the second suit in favor of the defendant Shaw against the plaintiff Alien Property Custodian, dismissing the plaintiff's bill of complaint, and granting the relief prayed for in the defendant's counterclaim, with costs and disbursements.

Settle decree on notice.