## ALLANWILDE TRANSPORT CORPORATION *v.* VACUUM OIL COMPANY.

### SAME *v.* PIDWELL.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

Nos. 449, 450. Argued December 12, 1918.—Decided January 13, 1919.

A charter of a sailing vessel and the bill of lading provided "Freight to be prepaid net on signing bills of lading," "Freight earned, retained and irrevocable, vessel lost or not lost." The vessel endeavored in good faith to make the voyage but was delayed by a storm requiring her return for repairs, and then indefinitely by the act of the Government in denying clearance to sailing vessels destined for the war zone. *Held*, that the carrier was relieved of the obligation to carry and need not secure transportation by other means or refund the prepaid freight. P. 385.

The bill of lading for other goods for the same voyage provided that the full freight should be due and payable on receipt of goods by the carrier, and that any payment in respect of them should be deemed fully earned and due and payable to the carrier at any stage before or after loading, without deduction, if unpaid, or refund in whole or in part, if paid, "goods or vessel lost or not lost, or if the voyage be broken up." It also exempted the carrier from liability "for any loss, damage, delay or default, . . . by arrest or restraint of governments, princes, rulers, or peoples." *Held, ut supra.* P. 386.

THE cases are stated in the opinion.

*Mr. Oscar D. Duncan*, with whom *Mr. Russell T. Mount* and *Mr. Courtland Palmer* were on the brief, for Allanwilde Transport Corporation.

*Mr. John C. Prizer* for Vacuum Oil Co. and Pidwell:

Freight is the compensation payable for the carriage and proper delivery at destination of the cargo. Scrutton, Charter Parties, Art. 136; 2 Parsons, Contracts, 9th ed., p. 422; *Kirchner v. Venus*, 12 Moo. P. C. 361; *Tirrell v. Gage*, 4 Allen, 245. If, for any reason, other than fault of the shipper, the cargo fails to arrive at destination in merchantable condition, no freight is earned. *Asfar & Co. v. Blundell*, [1896] 1 Q. B. 123; *The Harriman*, 9 Wall. 161; *The Kimball*, 3 Wall. 37, 44, 45; *Willett v. Phillips*, 8 Ben. 459; *Burn Line v. United States & Australasia S. S. Co.*, 162 Fed. Rep. 298. Where the voyage is interrupted by any cause, even by an excepted peril, the vessel may forward the cargo by another vessel to earn its freight; unless it does so, no freight is earned. *Hunter v. Prinsep*, 10 East, 378; *The Tornado*, 108 U. S. 342, 347; 1 Parsons, Admiralty and Shipping, p. 231.

Where a contract provides for prepayment of freight and delivery is prevented by some cause excepted in the charter-party, the American authorities, contrary to the English rule, require that the freight be refunded, since it has not in fact been earned. *The Kimball, supra; National Steam Nav. Co. v. International Paper Co.*, 241 Fed. Rep. 861, 862.

A stipulation that prepaid freight shall be irrevocable cannot lessen the obligation to perform the voyage or enlarge the exceptions by which the vessel has stipulated to excuse nonperformance. Even under the English rule prepaid freight can be recovered if the vessel has failed to perform the voyage in consequence of a cause against which it has not provided in its contract. *Great Indian Ry. Co. v. Turnbull*, 53 L. T. 325; *Dufourcet & Co. v.*

*Bishop*, 18 Q. B. D. 373; *Weir & Co.* v. *Girvin & Co.*, [1900] 1 Q. B. 45; Scrutton, Charter Parties, 7th ed., p. 304, note f.

The principle that impossibility of performance is no excuse is peculiarly applicable to maritime contracts; it is a frequent occurrence that performance becomes impossible, and it is important to know in advance which party has assumed the risk. It is therefore the universal practice to insert an enumeration of the perils for which the parties shall not be held responsible. Scrutton, Charter Parties, Art. 79; Carver, Carriage by Sea, 6th ed., § 74; Anson, Contracts, p. 325.

In the absence of an exception expressed in the contract, impossibility of performance is no excuse. *Spence* v. *Chodwick*, 10 Q. B. 517; *Hills* v. *Sughrue*, 15 M. & W. 253; *Kearon* v. *Pearson*, 7 H. & N. 386; *Jacobs* v. *Credit Lyonnais*, 12 Q. B. D. 589; Carver, Carriage by Sea, § 74. Even an absolute obligation of the charterer to load or discharge within a given number of days is not excused by a circumstance beyond his control. *Budgett* v. *Binnington*, [1891] 1 Q. B. 35, 40, 41; *Thies* v. *Byers*, 1 Q. B. D. ⁓ ᵗ; *Empire Transp. Co.* v. *Philadelphia &c. Co.*, 77 Fed. R. ᵖ. 919, 921.

An embargo does not abrogate but simply suspends the performance of a charter-party. *Hadley* v. *Clark*, 8 Term Rep. 259, 265–268. That case has been followed in this country in every case involving embargo. *Odlin* v. *Insurance Co.*, 2 Wash. C. C. 312, 317, 318; *M'Bride* v. *Marine Ins. Co.*, 5 Johns. 299, 308; *Palmer* v. *Lorillard*, 16 Johns. 348; *Bayliss* v. *Fettyplace*, 7 Massachusetts, 324; *Tirrell* v. *Gage*, 4 Allen, 245; *Lorent & Steinmetz* v. *South Carolina Ins. Co.*, 1 Nott & McC. 505, 509; *Kelly* v. *Johnson*, 3 Wash. C. C. 45; *Braithwaite* v. *Power*, 1 N. Dak. 455. See also Carver, Carriage by Sea, § 242; Abbott, Merchant Ships and Seamen, 14th ed., p. 874; 2 Parsons, Contracts, p. 828. The recent English cases

relied on by the carrier, and which are cited in Scrutton,
Charter Parties, 8th ed., p. 91, as discrediting the authority
of *Hadley* v. *Clark*, were not embargo cases, but were
cases in which the parties sought to rely upon the prin-
ciples of that case by analogy.

An embargo is almost inevitably indefinite as to dura-
tion. *M'Bride* v. *Marine Ins. Co.*, *supra*. It does not
render performance illegal within the usual meaning of
the term "illegality." *Lorent & Steinmetz* v. *South Caro-
lina Ins. Co.*, *supra;* 2 Parsons, Contracts, p. 828; *Bayliss*
v. *Fettyplace*, *supra*.

That the shipper, upon giving security, may compel the
surrender of his cargo is suggested in *Palmer* v. *Lorillard*,
*supra*. In *Braithwaite* v. *Power*, *supra*, the vessel was held
entitled to retain the cargo until resumption of naviga-
tion was possible, in order to earn freight.

The carrier, in repudiating its contracts and requiring
the shippers to retake their cargoes without returning the
prepaid freight and without giving security or promising
to carry out the voyage upon the lifting of the embargo,
committed a breach of contract. The measure of damages
is not merely the amount of the prepaid freight, but the
full damages sustained in consequence of the failure to
transport the cargo or cause it to be transported to desti-
nation.

The doctrine of "frustration of venture" as urged by
the carrier, is properly applicable only to contracts, or
the severable portions thereof, remaining executory on
both sides. With respect to a contract wholly executory
on both sides, while it may well be said that the happen-
ing of an event not anticipated by either party dissolves
the contract, it is idle to speak of dissolution where one
party has paid in advance the full consideration for a
service to be rendered by the other.

The carrier, by failing to insert any exceptions in its
charter-party or bill of lading (other than the dangers

of the seas) assumed an absolute obligation to deliver the cargo at destination. In almost every maritime case cited by it, the contract contained an exception of "restraint of princes, rulers, or peoples," which was expressly relied upon by the parties. The effect of the absence of exceptions is illustrated by *Hills* v. *Sughrue, supra; Budgett* v. *Binnington, supra; The Harriman, supra; Empire Transp. Co.* v. *Philadelphia &c. Co., supra.* The cases of *The Kronprinzessin Cecilie,* 244 U. S. 12, and *Watts, Watts & Co.* v. *Mitsui & Co.,* [1916] 2 K. B. 826; [1917] A. C. 227, are not authority for the proposition that the omission of such an exception is immaterial. In view of the emphasis laid upon the exception in both cases, and the fact that the cases, relied upon by this court in reaching its decision in the former case, contained a restraint of princes exception which was the principal reliance of the defense, they are authorities illustrating the practical importance of such an exception. See also *Nobel's Explosives Co.* v. *Jenkins,* [1896] 2 Q. B. 326; *Geipel* v. *Smith,* L. R. 7 Q. B. 404. That such an exception is necessary to excuse the vessel in the present cases is the view of the court in *The Gracie D. Chambers,* 253 Fed. Rep. 182.

The carrier not only inserted no restraint of princes clause to qualify its obligation, but expressly negatived such an exception by excepting "dangers of the seas *only*." Certainly the court will not imply a restraint of princes exception for the exclusive benefit of the carrier while leaving it in possession of the prepaid compensation for which the service has not been rendered.

MR. JUSTICE McKENNA delivered the opinion of the court.

The questions in the cases arise upon libels filed against the "Allanwilde" to recover prepaid freight for the trans-

portation of certain goods and merchandise to designated ports in Europe.

The solution of the questions turns upon (1) the asserted prevention of the adventure by a storm at sea which the vessel encountered, requiring her return to port for repairs, and (2) afterwards by the restraining power of the Government.

On November 1, 1917, the "Allanwilde," owned by the Allanwilde Transport Corporation, was seized upon libels filed by the Vacuum Oil Company and A. W. Pidwell, respectively, each of which had shipped certain goods to be carried from New York to Rochefort, France.

In May, 1917, the Oil Company chartered the vessel to carry a cargo of oil in barrels at the rate of $16.50 a barrel (changed afterwards to $15.25).

The charter party contained, inter. alia, the following provisions:

". . . freight to be prepaid net on signing bills of lading in United States gold or equivalent, free of discount, commission, or insurance. Freight earned, retained and irrevocable, vessel lost or not lost."

On August 25, the oil having been loaded, the vessel issued a bill of lading containing, inter alia, the following provision: "All conditions and exceptions of charter-party are to be considered as embodied in this bill of lading."

Pidwell was permitted to ship certain kegs of nails on the vessel, and on August 15 a bill of lading was issued to him. Inter alia, it provided that the carrier should not be liable for loss, damage, delay or default "by causes beyond the carrier's reasonable control; . . . by arrest or restraint of governments, princes, rulers, or peoples; . . . by prolongation of the voyage: . . ."

It is provided in paragraph 5 of the bill of lading that "full freight to destination, whether intended to be pre-

paid or collect at destination, and all advance charges
. . . are due and payable to (the Allanwilde Trans-
port Corporation) upon receipt of the goods by the latter;
. . . and any payments made . . . in respect
of the goods . . . shall be deemed fully earned and
due and payable to the carrier at any stage before or after
loading of the service hereunder without deduction (if
unpaid), or refund in whole or in part (if paid), goods or
vessel lost or not lost, or if the voyage be broken up;
. . ."

In pursuance of the contracts thus attested the oil and
the nails were shipped on the "Allanwilde" and the
freight was paid in advance—$49,745.50 for the oil and
$3,128.00 for the nails.

The vessel was seaworthy and properly manned and
equipped, and set sail September 11. After she had been
out about fourteen days and was about five hundred miles
from New York, she encountered a storm so severe that
her boats were carried away and she sprang a leak so
threatening that the water in her hold was three or four
feet deep and was gaining on the pumps. Thereupon the
master properly decided that he must seek a port of refuge
for safety and repair. Halifax was about five hundred
miles away, but in that direction the wind was against
him, while it was favorable for New York, and on this
account as well as for other good reasons be headed for
New York, where he arrived on October 5, having been
out twenty-four days. Repairs were undertaken at once,
the cargo remaining on board meanwhile.

"On September 28, while the vessel was at sea, the
government decided to refuse clearance thereafter to any
sailing vessel bound for the war zone. . . . The
master did not know of this decision until the vessel re-
turned to New York; he received no information from
the shore after September 11. The repairs being finished,
the vessel attempted to resume her voyage, but clearance

was refused, and none could be obtained in spite of her efforts to induce the government to modify its stand. Toward the end of October the shippers were notified by the carrier to unload their goods, and this they did, but under protest and reserving their rights. Afterwards, the oil was forwarded by steamship, but at a higher rate of freight and under other charges. What became of the nails after they were unloaded, does not appear. The vessel declined to refund the freight to either shipper, and the libels were filed to recover not only the prepaid freight, but also damages for failure to carry. On each libel the District Court entered a decree for the prepaid freight alone, refusing recovery for the other damages."

Upon these facts the Circuit Court of Appeals have certified four questions, two in each libel, as follows:

"1. Was the adventure frustrated, and was the contract evidenced by the charter-party and by the bill of lading issued to the Oil Co. dissolved, so as to relieve the carrier from further obligation to carry the oil?

"2. Whatever answer may be given to the first question, did the contract thus evidenced justify the carrier under the facts stated in refusing to refund the prepaid freight?

"3. Was the adventure frustrated, and was the contract evidenced by the bill of lading issued to Pidwell dissolved, so as to relieve the carrier from further obligation to carry the nails?

"4. Whatever answer may be given to the third question, did the contract thus evidenced justify the carrier under the facts stated in refusing to refund the prepaid freight?"

A copy of the charter party and copies of the bills of lading are attached to the certificate and also the official bulletin refusing clearance to "sailing vessels destined to proceed through the war zone."

The argument of counsel upon the elements of the ques-

tions is quite extensive, ranging through all of the ways in which contracts can be dissolved or their performance excused by the agreement of the parties or prevented by some supervening cause independent of the parties and dominating their convention. We do not think it is necessary to follow the argument through that range. It may be brought to the narrower compass of the charter party and the bills of lading.

The physical events and what they determined are certified. First, there was the storm, compelling the return of the ship to New York to avert greater disaster; then the action of the Government precluding a second departure. Does the contract of the parties provide for such situation and take care of it, and assign its consequences? The charter party provides, as we have seen, that "freight to be prepaid net on signing bills of lading. . . . Freight earned, retained and irrevocable, vessel lost or not lost." And it is provided that this provision is, with other provisions, "to be embodied" in the bill of lading. They seem necessarily, therefore, deliberately adopted to be the measure of the rights and obligations of shipper and carrier. Let us repeat: the explicit declaration is—"Freight to be prepaid net on signing bills of lading. . . . Freight earned, retained and irrevocable, vessel lost or not lost." The provision was not idle or accidental. It is easy to make a charge of injustice against it if we consider only the defeat of the voyage and the non-carriage of the cargo. But there are opposing considerations. There were expected hazards and contingencies in the adventure and we must presume that the contract was framed in foresight of both and in provision for both. We cannot step in with another and different accommodation. It is urged, however, that there is no provision in the contract (charter party and bill of lading) of the Oil Company excepting "restraint of princes, rulers and peoples" and that, therefore, the carrier was

not relieved from its obligation by the refusal of clearance to sailing vessels. And it is further urged that such embargo was at most but a temporary impediment and the cargo should have been retained until the impediment was removed or transported in a vessel not subject to it. We cannot concur in either contention. The duration was of indefinite extent. Necessarily, the embargo would be continued as long as the cause of its imposition—that is, the submarine menace—and that, as far as then could be inferred, would be the duration of the war, of which there could be no estimate or reliable speculation. The condition was, therefore, so far permanent as naturally and justifiably to determine business judgment and' action depending upon it. *The Kronprinzessin Cecilie*, 244 U. S. 12.

There is no imputation of bad faith. The carrier demonstrated an appreciation of its obligations and undertook their discharge. It was stopped, first by storm, and then prevented by the interdiction of the Government. In neither situation was it inactive. It quickly repaired the effects of the former and protested against the latter, joining with the shipper in an earnest effort for its relaxation. It gave up only when the impediment was found to be insurmountable.

The answer to the other contention is that the contract regarded the "Allanwilde," a sailing ship, not some other kind of ship or means. *The Tornado*, 108 U. S. 342; *The Kronprinzessin Cecilie, supra.*

The bill of lading in No. 450 is even more circumstantial. It provided that "Full freight to destination, whether intended to be prepaid or collect at destination, . . . shall be deemed fully earned and due and payable to the *carrier* at any stage before or after loading, of the service hereunder, without deduction (if unpaid) or refund in whole or in part (if paid), goods or vessel lost or not lost, or if the voyage be broken up." And there is exemption

377.                    Argument for Petitioner.

from liability "for any loss, damage, delay or default, . . . by arrest or restraint of governments, princes, rulers, or peoples; . . ."

The questions certified are therefore answered in the affirmative.

*So ordered.*