**TEXAS CO. v. HOGARTH SHIPPING CO., Limited, et al.** *

(District Court, S. D. New York. February 3, 1919.)

1. **Shipping ⊙⇒39—Clause in charter held not equivalent to restraint of princes clause.**

   Clauses in a charter limiting the use to trade lawful for ships of that nationality, and prohibiting breach of warranties in insurance policies that the ship shall comply with the orders of the government, and shall not start on a voyage, if ordered not to do so, are not equivalent to the ordinary restraint of princes clause.

2. **Shipping ⊙⇒39—Charter becomes one for particular vessel, when vessel is designated.**

   Where the charter left the particular vessel for the voyage to be designated at a date fixed therein, and the vessel was designated in accordance with those terms, the charter then became a charter for the voyage for that vessel, and no other.

3. **Shipping ⊙⇒51—Formal requisition by government immaterial, after chartered ship is taken without owner's consent.**

   Where a chartered ship was taken by the owner's government for war use, without the consent of the owner or any act by him to induce such taking, except to have it used for a more profitable transportation, it is immaterial, in determining the owner's rights under a charter, whether there was a valid requisition by the government or not.

4. **Shipping ⊙⇒51—Owner not obliged to substitute another vessel for one taken by government.**

   Where the vessel which the owner chartered for a particular voyage was taken by the owner's government before time for the voyage, the owner was not obliged to substitute another vessel to perform the charter.

5. **Shipping ⊙⇒51—Taking of vessel by foreign government renders performance of charter impossible.**

   Where a vessel was taken by the owner's government for war use without the owner's procurement or consent, the performance of a charter for a voyage by that particular vessel was rendered legally impossible, so that the owner was not liable in damages for failure to furnish the vessel for the voyage.

6. **Admiralty ⊙⇒31—May recognize equitable defense of impossibility of performance.**

   Courts of admiralty may recognize the defense of impossibility of performance of the charter, which is an equitable rather than a strictly legal defense.

In Admiralty. Libel by the Texas Company against the Hogarth Shipping Company, Limited, and another. Libel dismissed.

Final hearing in Admiralty. Action for breach of voyage charter party. In February, 1915, a written agreement was made in New York between libelant (an American corporation) and Hogarth Shipping Company (a British corporation), whereby libelant agreed to charter a steamship to carry a cargo of case petroleum from Port Arthur, Tex., to South African ports, lading to be made between April 15 and May 15, and steamship to be declared on or before March 15. On or about March 11, Hogarth Company declared the British steamship Baron Ogilvy to fulfill this contract, and libelant accepted her. At this date a large proportion (two-thirds) of respondent's vessels were in government service, the demand for shipping by the British government was increasing, the Ogilvy was a cargo boat, suitable for carriage of live stock as well as ordinary freight, and before the end of March, the Ogilvy being then in English waters, respondents were advised that her "requisitioning" was likely; the possibility of such governmental action was known to both parties when the chartering contract was made in February.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Decree affirmed 267 Fed. —-.

The said contract contained no "restraint of princes," etc., clause, but did contain the following:

"It is a condition of this charter and the charterers undertake that: (1) The ship shall be employed only in such trades and employments and shall carry only such goods, persons and things as are lawful for a British ship. * * * (3). There shall not be any breach of any of the warranties which are now or may during the continuance of this charter be contained in the policies or contracts of insurance of the ship with the War Risks Insurance Association in which the ship is entered. The warranties now contained in such policies are as follows: (a) That the ship shall comply, so far as possible with the orders of his majesty's government and the directions of the committee as to routes, ports of call and stoppages. (b) That the ship shall not start on the voyage if ordered by his majesty's government not to do so. * * * The above clauses to be incorporated in all bills of lading."

On April 10 a representative of the "Lord Commissioners" of the British Admiralty telegraphed to respondent's agents in Glasgow that "The Baron Ogilvy is requisitioned under royal proclamation for government service." This telegram was received by a member of the firm of Hugh Hogarth & Sons, managers for Hogarth Shipping Company, owners of the Ogilvy and 11 other steamships. No reason appears why the copartnership should have been joined in this action, and no further attention will be paid to such joinder.

Respondents did not seek this governmental occupation, which was far less profitable than their charter with Texas Company, nor did they attempt to have the requisition set aside, but there is some evidence that they succeeded in having the Ogilvy devoted to the carriage of mules at somewhat higher rates than other cargo. The loss, however, as compared with the agreed cargo of petroleum, was severe.

Libelants were at once notified that, owing to the requisition, respondents would be unable to enter upon or perform their charter agreement of February, and it was fully proved that the Ogilvy was exclusively and continuously used by the British government from April 10 until October 20, 1915, or until a date long subsequent to the probable completion of the chartered voyage. In September 1915, this libel was filed, claiming damages for breach of charter by refusing to tender the Ogilvy for loading. The answer alleged (1) frustration of contract and (2) that the quoted clauses of the charter agreement were equivalent to the usual "restraint of princes" clause.

Before hearing the British ambassador obtained leave to appear as amicus curiæ, and filed a suggestion and certificate, which in effect stated the fact of requisition and the dates of use of the steamship, declared that such requisition was for an indefinite period, and avowed the whole transaction as a "governmental act by the government of Great Britain and Ireland."

H. S. Deming and Wharton Poor, both of New York City, for libelant.

Howard Thayer Kingsbury, of New York City, for British Embassy.

John M. Woolsey and D. M. Tibbetts, both of New York City, for respondent.

HOUGH, Circuit Judge. Reflection on this very interesting case has led to the belief that it very fairly presents a question not peculiar to the admiralty, nor logically depending for existence on a state of war, although war presents the problem in an acute way, and one attracting more general attention than is commonly given to the events of peace. That question is: Was the performance of the contract, for the breach of which this action is brought, prevented by the impossibility of performing it, within the modern meaning of that phrase?

[1] Much discussion has been had concerning the efficacy of the certificate of the British ambassador. I do not now think it necessary to

place judgment on any resolution of that query, and by some findings of fact will attempt to show why, and to reduce the case to the point of legal impossibility, by which phrase I mean an impossibility recognized by law as dissolving a contract. The parties executed an agreement or charter party containing no "restraint of princes" clause, and (as I construe the document) no other clause or rider thereof authorized either party to invoke the line of decisions construing and enforcing that phrase.

[2] The charter named no special ship as the subject of hire for the voyage agreed upon. That was the only matter therein left open; but, the moment the shipowners named the Baron Ogilvy as the vessel to perform that agreement, the charter became an ordinary voyage charter for that vessel, and none other. She was for all legal purposes the ship, and the only ship, that could perform that particular agreement.

[3] Whether there was what libelants call a "valid requisition" by the British crown or not is immaterial, in the sense that the point is not controlling. If I accept the certificate of the ambassador, of course there was; but I avoid without decision that question, now before higher authority in The Gleneden, and hold on the evidence that the British government took and used the Baron Ogilvy, at and during the very time when the respondents had agreed to devote her to libelant's service, and further that such use was in invitum, except in the sense that all British shipowners were, I presume, patriotically willing to have their vessels used for warlike purposes if and when no other man's ship was available.

In point of fact, respondents did not cause nor contribute to the taking over by government of the Ogilvy; probably it was no great surprise, but libelant was equally aware at and after charter date of the possibility of requisition. As matter of law, respondents were not bound to use effort to prevent requisition—i. e., to shift the burden to some other shipowner's shoulders in the interest of either themselves or libelants—and it was entirely within their right to seek (when governmental use was certain) the carriage of mules, instead of something else, if mules promised less loss than other probable freight. This they did; nothing more.

[4] Finally, libelants were under no legal obligation to substitute another vessel for the Ogilvy, any more than they were bound to make a new charter with libelants. Legally the two propositions are identical.

[5] Thus the question for decision comes to this: If the means, and the only means, whereby an American contract can be performed, is taken away by a foreign government, so that performance becomes physically impossible, is the contract dissolved, so that losses or damages resulting from nonperformance lie where they fell in the first instance? This is a large query; but some of the elements stated are still immaterial or irrelevant. The fact that the interfering action was governmental and foreign has been the groundwork or moving cause of libelant's action; that is, reliance is placed on decisions holding that foreign governmental vis major preventing performance does

not excuse. No decision binding on this court goes so far as to give the rule as above stated and insisted on by libelant. Whether the English cases touching the matter can be reconciled I more than doubt, and am not much concerned with; but neither Liverpool, etc., Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, nor Rederiaktiebolaget Amie v. Universal Transp. Co., 250 Fed. 400, 162 C. C. A. 470, decided more than that one who in this country made a lawful contract, not in accord with the law of his own country, could not plead the foreign law to prevent his paying damages.

That is a very different thing from destroying (in a very real sense) the subject-matter of agreement. If it be true, as I believe it to be, that for the purposes of this suit the Ogilvy was or became nonexistent, then the governmental element becomes as unimportant as the foreign, also the absence of the "restraint" clause, and the question is really reduced to its lowest terms, viz. whether the facts present a case of that "impossibility of performance" which is and long has been a recognized and growing reason for dissolving a contract.

That "ordinarily" impossibility is no defense has been said often enough. It was a common-law rule, and is consonant with the often referred to "unmorality" of our immemorial custom. For lawyers' purposes it practically rests on Paradine v. Jayne, Aleyn, 26. For a modern application, see Rowe v. Peabody, 207 Mass. 226, 93 N. E. 604. But the defense is equitable, at least in a broad sense, and as equitable defenses have made their way at law, so the doctrine of impossibility has advanced.

Wars, and the demands and destructions of war, do not change the law in one sense; but in another they do, by multiplying and enforcing circumstances showing the need of change—of modernization. Without war, there had come to be recognized (inter alia) two well-known grounds of dissolution by impossibility—destruction of subject-matter without any one's fault, and failure of mutually contemplated means of performance. Under these heads the Great War has only furnished innumerable instances and applications. I think this litigation is one of them.

For tracing through multiplied decisions, and attempting to recognize and display the dominant lines of argument, I have no time; nor is that sort of thing useful in a court of first instance. Respondent's brief consists frankly in Mr. Mackinnon's pamphlet, "Effect of War on Contract." With its reasoning I agree, though (as above indicated) it seems to me more philosophical to regard the matter as a growth of equity, humanizing the common law.

[6] In admiralty we may recognize and enforce equitable principles, without the strain that is often amusingly evident on the law side. The matter is one that has attracted comment for years in legal periodicals; reference to the volumes of the Harvard Law Review as noted below[1] will give a key to the modern American cases. Of destruction of subject-matter, Martin Emerick Outfitting Co. v. Siegel, 237 Ill. 610, 86 N. E. 1104, 20 L. R. A. (N. S.) 1114, is a good ex-

[1] Vols. 14, p. 464; 15, pp. 63 and 418; 19, p. 462; and 12, p. 501.

ample, and of failure of contemplated means, Clarksville, etc., Co. v. Harriman, 68 N. H. 374, 44 Atl. 527.

The phrase "frustration of venture" has obtained much vogue of late, and The Allanwilde, 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15, will increase it. To me it seems only an equivalent for, and no improvement on, "impossibility of performance," using impossibility in the practical sense so well illustrated by Maule, J., when he pointed out that a shilling might be retrieved from deep water, yet legally it was "impossible" to do it, because no sensible man would attempt the foolish job.

Libel dismissed, with costs.