**ALCOA S. S. CO., Inc. v. UNITED STATES.**

United States District Court
S. D. New York.

April 30, 1948.

Wood, Molloy, France & Tully, of New York City (Melville J. France and Henry P. Molloy, Jr., both of New York City, of counsel), for plaintiff.

John F. X. McGohey, U. S. Atty., of New York City (William H. Postner, of New York City, of counsel), for defendant.

LEIBELL, District Judge.

The facts set forth in the above findings warrant the conclusion that the sum of $3,520.52 was illegally withheld by the Comptroller General on February 2, 1946 as a set-off against freight admittedly due for shipments on the SS. Plow City and the SS. Alcoa Trader. The set-off represented a sum which had theretofore been paid by the Comptroller General to the plaintiff as freight on a shipment of lumber on the SS. Gunvor, owned and operated by the

plaintiff, which was lost through enemy action on June 14, 1942. The legal question presented involves the interpretation of the provisions of the government bill of lading and of the bill of lading of the carrier. The rules and conditions of the carrier's bill of lading were incorporated into the government's bill of lading by reference, "unless otherwise specifically provided or otherwise stated on" the government's bill of lading.

The carrier's bill of lading contained the customary provision that the freight was to be deemed fully earned and due and payable—goods or vessel lost or not lost—whether freight was to be prepaid or to be collected at destination. If there is nothing in the government's bill of lading, specifically providing to the contrary, i.e., that the freight shall not be earned and due and payable if the goods or vessel are lost, then the sum of $3,520.52 was improperly deducted by the Comptroller General.

The government contends that the provisions in paragraph 1 of the conditions and in paragraph 2 of the instructions, on the back of the government's bill of lading, are so clearly inconsistent with the provisions of paragraph 6 of the terms printed on the back of the carrier's bill of lading (all of which are quoted in the findings) as to bar the carrier from any claim for freight on any shipment which was not delivered at destination, even though delivery was made impossible through the destruction of the carrier's vessel by enemy action.

■ I am of the opinion that the aforementioned provisions of the bills of lading are not inconsistent. The provisions of its own bill of lading, cited by the government, have to do with the "evidence" that must be presented by the carrier to collect freight showing delivery to the proper person when delivery of the shipment has been made. The provision of the carrier's bill of lading, which declares that the freight is payable "goods or vessel lost or not lost", covers the liability of the shipper for freight if there is no delivery at all because the goods have been destroyed through no fault of the carrier. The two provisions can thus be given effect in re-

spect to the situations to which they apply: the one where there is a delivery of the shipment; the other where the shipment is lost.

■ A bill of lading is "accomplished" not by transportation of the shipment to its destination. Something more is required; the delivery at destination must be made bona fides to the person apparently having the right to receive the shipment.

The word "accomplished" when used in association, with the term "bill of lading" has had a meaning in mercantile circles which goes back to the time when a bill of lading was prepared and signed in a set. It was customary to insert in bills of lading drawn in sets the provision that one of them "being accomplished, the others to stand void". The duty devolved on the master to make delivery to the rightful owner and if he had no knowledge that any other part of the bill of lading, other than the part presented had been indorsed, he could "properly and safely deliver in accordance with the indorsement and holding of the part presented, without inquiry as to the other". Carver on Carriage of Goods by Sea, Sec. 502. "If upon one of them the shipowner acts in good faith, he will have 'accomplished' his contract, will have fulfilled it, and will not be liable or answerable upon any of the others". Glyn v. East & West India Dock Co. (1882), 7 A.C. 591 at p. 599 cited in Sec. 55. See G. H. M. Thompson, "Bills of Lading" p. 211, where he uses the word "executed" as meaning the same thing as "accomplished"—"One bill being executed, the others to be void". See also Leggett, "Bills of Lading" p. 569; and Duckworth, "Charter Parties and Bills of Lading" page 74.

The government bill of lading in the case at bar was not drawn in the form of a set. Paragraph 2 of the Instructions on the back of the bill of lading directed that a "Shipping order, original bill of lading, and memorandum bill of lading should be used in making a shipment". That paragraph also stated that "Only one original bill of lading will be issued for a single shipment". The paragraph then goes on to state what shall be done with the documents: the shipping order shall be fur-

nished the initial carrier; the original bill of lading and memorandum copies shall be signed by the agent of the receiving carrier, returned to the consignor and the original promptly mailed to the consignee. Then, "the consignee on receipt of the shipment will sign the consignee's certificate on the original bill of,lading and surrender the bill of lading to the last carrier. The bill of lading then becomes the evidence upon which settlement for the services will be paid".

It is clear that the government did not intend to pay on presentation of any of the memorandum copies of the bill of lading; they were to be "used as administration officers direct". The government required presentation of the original bill of lading, with the consignee's certificate duly signed. To meet a situation where the original bill of lading was lost or destroyed, paragraph 4 of the Instructions provided that the carrier shall be furnished by the consignee with a "Certificate in Lieu of Lost Bill of Lading", on the standard form prescribed therefor "which when finally consummated by acknowledgment of the 'Certificate and Waiver by the Transportation Company' shall accompany the bill for services submitted by the carrier to the officer charged with the settlement of the account".

The words "accomplished" and "accomplishment", in relation to the bill of lading, appear in paragraph 6 of the Instructions on the government's bill of lading, which deals with loss or damage to property while in the possession of the carrier. Paragraph 6 provides that "such loss or damage shall when practicable, be noted on the bill of lading or certificate in lieu thereof, as the case may be before its accomplishment". But "should the loss or damage not be discovered until after the bill of lading or certificate has been accomplished, the proper officer shall be notified as soon as the loss or damage is discovered * * *".

██ If the government wanted to negative the provisions of paragraph 6 of the terms of the carrier's bill of lading, in relation to the payment of freight "Goods or vessel lost or not lost", it could have done

so in a single sentence by providing that no freight shall be payable if the shipment is lost. The government prepared the form of its own bill of lading. If it is indefinite or ambiguous, that is not the fault of the plaintiff. If it permits of more than one interpretation, the plaintiff is entitled to the more favorable interpretation.

██ The question of the right of a carrier to payment of freight where the cargo is lost with the destruction of the vessel or where the carrier is unable to present a bill of lading properly accomplished, was before the Comptroller of the Treasury during the First World War. In Volume 24, Decisions of the Comptroller of the Treasury, p. 707 (May 27, 1918) it was held that the liability of the government for freight charges would arise "when the shipment is actually made, whether delivered to destination or lost with the destruction of the vessel". On April 7, 1942 the Comptroller General rendered an opinion to the Secretary of the Navy (Vol. 21 D.C. G. p. 909) in which he held that where the carrier claimed charges without being able to present evidence of delivery, it could be required to show the facts and circumstances it relied upon as relieving it from the duty "to effect delivery and to obtain, receipt from the consignee". There are decisions of the Comptroller General in December 1942 and subsequent thereto refusing payment of freight where the goods shipped were lost by enemy action and so not delivered at destination. But there do not appear to have been any to that effect in June 1942 or prior thereto. The SS. Gunvor was lost June 14, 1942. The payment of freight on the shipment of lumber on the SS. Gunvor was made September 15, 1942. When the plaintiff received the shipment on the SS. Gunvor in June 1942, it was entitled to rely on the prevailing interpretation of these bills of lading provisions in relation to payment of freight, where the vessel is lost.

██ There is nothing unusual or unconscionable about the provisions of paragraph 6 of Alcoa's bill of lading. Although the common law rule was that freight was earned only if the shipment was delivered (The Louise, D.C., 58 F.Supp. 445), nev-

ertheless for many years bills of lading have contained the provision that freight was considered earned, vessel lost or not lost. And such provisions have been upheld where the loss was not due to the negligence of the carrier. Allanwilde Transport Corp. v. Vacuum Oil Co., `248 U.S. 377, at page 385, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15. The government knew of this practice when it prepared its own form of bill of lading, standard form No. 1059, approved by the Comptroller General August 24, 1928.

In The Quarrington Court, 122 F.2d 266, at page 263 the Circuit Court of Appeals, this Second Circuit held that:—

"The provision that freight was payable on destination at outturn weight does not override the provision that it is to be paid regardless of the loss of the ship."

The provision as to payment destination at outturn weight and the provision as to payment on presentation of the bill of lading properly accomplished are of almost equal significance. If the one was held not inconsistent with a provision that freight was payable regardless of. the loss of the ship, the other should receive a similar interpretation.

■ In construing the provision of the bills of lading in relation to the shipment on the SS. Gunvor we may take judicial notice of the fact that in June 1942 there was real danger of loss of the vessel in the Caribbean due to the activity of enemy submarines. The bill of lading of the carrier contained a war clause (par. 30) to the effect that "this shipment is at the sole risk of the owners thereof, of all risks of war" including "sinking by exploding mines, torpedoes, or otherwise". The government needed the lumber shipped on the SS. Gunvor in the construction of war bases at Trinidad. The carrier was willing to undertake the carriage in an area of war activity. If the carrier was to be deprived of its rights under the clause that freight was payable "Goods or vessel lost or not lost", that should have been clearly and specifically stamped thereon or stated in the government's printed bill of lading, as it did in paragraph 7 of the printed conditions of the government's bill of lading in respect to the rules and conditions governing commercial shipments as to the period within which notice of claim shall be given the carrier and suit instituted.

Plaintiff brings this suit under the Tucker Act, 28 U.S.C.A. § 41(20), which provides in part:—

"Section 41. Original jurisdiction. The district courts shall have original jurisdiction as follows:

\* \* \* \* \* \*

"Concurrent with the Court of Claims, of all claims not exceeding $10,000 founded upon the Constitution of the United States or any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable, and of all set-offs, counterclaims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever on the part of the Government of the United States against any claimant against the Government in said court; \* \* \*."

■ The government contends that the action should have been brought under the Suits in Admiralty Act, 46 U.S.C.A. § 742, arguing that the bill of lading was a maritime contract and related to a cargo owned by the United States. A similar question was before Judge Hulbert in American President Lines v. United States, D.C., 75 F.Supp. 110, and he held that this Court had jurisdiction under 28 U.S.C.A. § 41(20), and that the claim was not one contemplated by the Suits in Admiralty Act. I agree with his conclusion, for the reasons stated therein and the decisions cited to support it.

■ The defendant is urging that this Court's sole source of jurisdiction to hear plaintiff's claim is under the Suits in Admiralty Act and that therefore the complaint herein should be dismissed because of the two year statutory limitation on actions brought under the Suits in Admiralty Act. Assuming arguendo, that only a

court of Admiralty has jurisdiction of plaintiff's claim, if the action were transferred to the Admiralty side of this court, the two year statute would not bar it, since the claim arose on February 2, 1946, when the illegal deduction of $3,520.52 was made by the Comptroller General. What the defendant seeks is a dismissal of the action, requiring the institution of a new suit, one under the Admiralty Act, which might furnish some basis for a defense of the statute of limitations.

It is unnecessary to transfer this suit to the Admiralty Calendar. The action is founded upon a contract for carriage of the shipment by a private vessel as evidenced by the bill of lading. The fact that the government owned the cargo does not make this a claim to which the Suits in Admiralty Act applies. The Suits in Admiralty Act substituted a libel in personam for a libel in rem where a government owned merchant vessel or cargo might otherwise be subject to an in rem proceeding. The cargo that was carried on the SS. Gunvor was completely lost and the cargoes carried on the SS. Plow City and SS. Alcoa Trader were delivered. No in rem proceeding could be brought against any of those cargoes. No proceeding in rem could have been brought, if the cargo had been privately owned, at the time this action was commenced. See § 742 of 46 U.S.C.A. Any lien on the cargo for freight is relinquished by delivery of the cargo. Eastern Transportation Co. v. United States, 2 Cir., 159 F.2d 349.

The claim here is based on the action of the Comptroller General in unlawfully withholding a sum due for freight. It is also founded upon a law of Congress, Sec. 322 of the Transportation Act, 49 U.S.C.A. § 66, which provides:

"§ 66. Government traffic; payment for transportation; deduction of overpayments

"Payment for transportation of the United States mail and of person or property for or on behalf of the United States by any common carrier subject to chapters 1, 8, and 12 of this title, as amended, or chapter 9 of this title, shall be made upon presentation of bills therefor, prior to audit or settlement by the General Accounting Office, but the right is hereby reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier. Sept. 18, 1940, c. 722, Title III, § 322, 54 Stat. 955."

The action of the Comptroller General, as his notice of July 24, 1944, stated, was taken "pursuant to Sec. 322 of the Transportation Act" 49 U.S.C.A. § 66. The claim of plaintiff arose as a result of that action. The Supreme Court has held that there is no distinction between claims "arising under" and those "founded upon" a law of the United States. United States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825. See also Carriso Inc. v. United States, 9 Cir., 106 F.2d 707.

For the reasons hereinabove stated I have concluded that his court has jurisdiction of this claim under the Tucker Act and that the plaintiff is entitled to judgment on the merits for the amount claimed.

This cause having been tried on April 2, 1948, and the Court having heard the evidence and arguments of counsel and considered their briefs, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact.

1. The plaintiff at all the times herein referred to was a corporation duly organized and existing under the laws of the State of New York, with its office at No. 17 Battery Place, Borough of Manhattan, City and State of New York. The defendant is a sovereign.

2. The plaintiff carried on its vessels at the request of and for the defendant certain consignments of lumber as follows:

1. On the SS. Plow City, in and about January 1942, from St. Joe, Florida, to Port of Spain, Trinidad, B.W.I., 1,150,768 feet of lumber.

2. On the SS. Alcoa Trader, in and about November, 1941, from Tampa, Florida, to Port of Spain, Trinidad, B.W.I., 87,113 feet of lumber.

The said shipments were duly delivered to the defendant at Port of Spain, Trinidad, B.W.I.

The freight charge for the foregoing shipments was $24,453.83 for the shipment on the SS. Plow City, and $17,788.65 for the shipment on the SS. Alcoa Trader.

3. Those amounts were billed by the plaintiff to the defendant (represented by the War Department, Finance Officer, U. S. Army, Washington, D. C.) on the prescribed "Public Voucher for Transportation of Freight or Express", and thereafter the said sums were paid by the defendant to the plaintiff; $24,453.83 on or about March 25th, 1942, and $17,788.65 on or about March 19th, 1942. (Exhibits annexed to complaint.)

4. Thereafter the plaintiff presented to the defendant a bill for freight, for cargo, other than the foregoing, carried by the plaintiff from New York to Port of Spain, Trinidad, in the amount of $23,137.79. On the 11th day of January, 1945, the Comptroller General of the United States allowed $22,779.44 of said sums, and then deducted from said allowance of $22,779.44 (1) an item of $4,890.77, claimed to be an overpayment in that amount of the freight theretofore and on or about March 25th, 1942, paid to the plaintiff for the aforesaid shipment of cargo on the SS. Plow City and (2) an item of $3,557.73, claimed to be an overpayment in that amount of the freight theretofore and on or about March 19th, 1942, paid to the plaintiff for the aforesaid shipment of cargo on the SS. Alcoa Trader. (Ex. 1).

5. The basis of the foregoing deduction for overpayment made by the Comptroller General was that the prevailing tariff did not permit a surcharge of 25%, which had been incorporated in the aforesaid freight bills for cargo carried on the SS. Plow City and SS. Alcoa Trader, respectively.

6. On December 18, 1944, the General Accounting Office notified plaintiff (Ex. 2) that it would give consideration to any material evidence which the plaintiff might offer to sustain the validity of the said surcharge of 25%.

7. On February 16, 1945, the plaintiff did submit such evidence and support for the validity of the 25% surcharge (Ex. 3) and thereafter in August, 1945, the Comptroller General indicated that he would consider applications for the refund of said items of $4,890.77 and $3,557.73 deducted as aforesaid on January 11, 1945.

8. On or about January 9th, 1946, the plaintiff did file its claims (Exs. 4 and 5) with the Comptroller General for refunds of the said sums of $4,890.77 and $3,557.73.

9. On February 2, 1946, the Comptroller General advised the plaintiff of his disposition of the two said claims for refund as follows (Ex. 6):—

Amount claimed $8,448.50
Amount allowed $4,927.98
Difference $3,520.52

Bill G–534, Voucher 329413, 3/42 W.M. Dixon B/L WE–231286, 11/17/41
Alcoa Steamship Co., Inc., New York office. Paid $14,230.92 Should be $17,788.65 due carrier $3,557.73.
Bill G–639, Voucher 357409, 3/42, W. M. Dixon, B/L WE–298987 1/1/42
Port of St. Joe, Fla., to Port of Spain, Trinidad, B.W.I.
Alcoa Steamship Co., Inc., New York office. Paid $19,563.06 Should be $24,453.83 due carrier $4,890.77.

### Deduction

Bill G–1247, Voucher 295647, 9/42, J. P. Tillman, B/L WE–310320 6/13/42
Mobile, Alabama to Port of Spain, Trinidad, B.W.I. Paid $3,520.52 Should be Nil Overpaid $3,520.52

The government bill of lading on which the property was shipped contemplated payment upon presentation of said bill of lading showing delivery at destination. The bill of lading does not show delivery as contemplated and the record does not establish any requirement for payment otherwise. Consignee's Certificate of Delivery states "S.S. Gunvor has been lost due to enemy action".

10. The aforesaid deduction of $3,520.52 was for freight money paid to the plaintiff September 15, 1942 (Ex. 7), for a shipment of government cargo of lumber on the SS. Gunvor from Mobile, Ala-

bama, to Port of Spain, Trinidad, for which there was issued a "government bill of lading" dated June 13th, 1942 (Ex. 9) which provided in part as follows:

### General Conditions and Instructions
#### Conditions

It is mutually agreed and understood between the United States and carriers who are parties to this bill of lading that—

1. Prepayment of charges shall in no case be demanded by carrier, nor shall collection be made from consignee. On presentation to the office indicated on the face hereof of this bill of lading, properly accomplished, attached to freight voucher prepared on the authorized Government form, payment will be made to the last carrier, unless otherwise specifically stipulated.

2. Unless otherwise specifically provided or otherwise stated hereon, this bill of lading is subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier.

### Instructions
\* \* \*

2. Shipping order, original bill of lading, and memorandum bill of lading should be used in making a shipment. Only one original bill of lading will be issued for a single shipment. The shipping order should be furnished the initial carrier. The original bill of lading and memorandum copies should be signed by the agent of the receiving carrier, returned to the consignor, and the original promptly mailed to the consignee. The consignee on receipt of the shipment will sign the consignee's certificate on the original bill of lading and surrender the bill of lading to the last carrier. The bill of lading then becomes the evidence upon which settlement for the service will be made. Memorandum copies of bills of lading may be used as administrative officers direct.

4. In no case will a second bill of lading be issued for a shipment, nor will a bill of lading be issued after the transportation has been performed. In case the bill of lading has been lost or destroyed, the carrier shall be furnished by the consignee with a "Certificate in Lieu of Lost Bill of Lading," on the standard form prescribed therefor which when finally consummated by acknowledgment of the "Certificate and Waiver by Transportation Company," shall accompany the bill for services submitted by the carrier to the officer charged with the settlement of the account. Should the original bill of lading be located after settlement has been made on the certificate, it will be forwarded to the administrative office of the department concerned for transmittal to the General Accounting Office.

\* \* \* \* \* \*

6. In case of loss or damage to property while in the possession of the carrier, such loss or damage shall, when practicable, be noted on the bill of lading or certificate in lieu thereof, as the case may be, before its accomplishment. All practicable steps shall be taken at that time to determine the loss or damage and the liability therefor, and to collect and transmit to the proper officer, without delay, all evidence as to the same. Should the loss or damage not be discovered until after the bill of lading or certificate has been accomplished, the proper officer shall be notified as soon as the loss or damage is discovered, and the agent of the carrier advised immediately of such loss or damage, extending privilege of examination of shipment.

11. The form of Consignee's Certificate (foot of Ex. 11) referred to in paragraph 2 of the "Instructions" in government's bill of lading is as follows:—

### Consignee's Certificate of Delivery

I have this day received from —————— —————— (name of transportation company) at —————— (actual point of delivery by carrier) the public property described in this bill of lading, in apparent good order and condition, except as noted on the reverse hereof. Delivery service at destination was/was not by the Government. Weight —————— pounds. ——————

| (in words) | (in figures) |
| --- | --- |
| (Consignee) | (Date) |

12. The usual form of the plaintiff's bill of lading, (Ex. 10) in use at the time of

the said shipment of cargo on the SS. Gunvor provided as follows:—

3. The Goods, whether perishable or not, are accepted by the Carrier subject to delays or default in shipment, transportation, delivery or otherwise occasioned by war, rebellion, riots, strikes, stoppage of labor, lockouts or labor troubles of Carrier's employees or others; shortage of labor, fuel, conveyances or room; lack of facilities of any sort; accumulation of cargo; weather, ice; or any conditions, whether or not of a like kind to those herein stated, not shown due to Carrier's fault; and notice to shipper or others of any danger of such delay or default is hereby waived; and the Carrier shall not be responsible for any such delay or default; and if loading of the Goods in the customary manner is delayed, or the Vessel is likely to be detained she may proceed without loading or completing the loading of the Goods.

\* \* \* \* \* \*

6. Full freight to destination, whether intended to be prepaid or collected at destination, and all advance charges against the Goods are due and payable to Alcoa Steamship Company, Inc., as soon as the Goods are received for purposes of transportation; and the same and any further sums becoming payable to the Carrier hereunder and extra compensation, demurrage, forwarding charges, general average claims, and any payments made and liability incurred by the Carrier in respect of the Goods (not required hereunder to be borne by the Carrier) shall be deemed fully earned and due and payable to the Carrier at any stage, before or after loading, of the service hereunder, without deduction (if unpaid) or refund in whole or in part (if paid). Goods or Vessel lost or not lost, or if the voyage be broken up; and the same shall be payable in lawful money of the United States; and the Carrier shall have a lien on the Goods therefor (whether payable in advance or not and though noted hereon as prepaid); and said lien shall not be waived even though the goods are delivered to a carrier, or landed on the pier, or placed in storage; and in case of loss of any part of the Goods, the Carrier shall have a lien on the

Goods or any part or proceeds for the whole thereof; and the shipper, consignees and/or assigns shall be jointly and severally liable therefor, and notwithstanding any lien therefor has been surrendered.

\* \* \* \* \* \*

30. It is mutually agreed, that in addition to the other terms and conditions of the bill of lading which shall be deemed affected only so far as inconsistent herewith, this shipment is at the sole risk of the owners thereof, of all risks of war, preparations for war, arrest, restraint, capture, seizure, destruction, detention, sinking by explosive mines, torpedoes, or otherwise, interference or hostilities on the part of any Power and of all consequence thereof and the vessel shall have liberty in the discretion of the master, owner or any agent or charter thereof to proceed notwithstanding any such risks: \* \* \*.

13. While on her voyage carrying the aforesaid government shipment of lumber, the SS. Gunvor was lost due to enemy action, June 14, 1942.

14. On or about the 15th day of September, 1942 the War Department, U. S. A. paid the plaintiff the aforesaid freight monies in the sum of $3,520.52. (Exs. A & B; Ex. 7)

15. On or about July 24th, 1944, the Comptroller General, referring to the payment of the aforesaid sum of $3,520.52 as "overpayment", advised the plaintiff as follows (Ex. 8):—

"In the audit of your bill described above an overpayment has been noted as explained below.

"Pursuant to Sec. 322 of the Transportation Act, 1940, 54 Stat. 955 [49 U.S.C.A. § 66], a deduction will be made from an amount otherwise due your company unless the amount thus overpaid is refunded within sixty (60) days,—check to be made payable to 'The United States' and mailed direct to this office".

16. On February 2, 1946 the Comptroller General deducted (Ex. 6) the aforesaid sum of $3,520.52 (freight paid on the SS. Gunvor shipment) from a sum of $8,448.50 found due to the plaintiff as balance of freight on shipments on the SS. Plow City and SS. Alcoa Trader.

17. The defendant has neglected and refused to pay the plaintiff the said sum of $3,520.52, although duly demanded.

18. This action was commenced July 10, 1946 by the filing of the complaint in the office of the Clerk of this Court.

Conclusions of Law

I. This Court has jurisdiction of the subject matter of this action under 28 U.S.C.A. § 41(20).[1]

II. This cause of action arose February 2, 1946. The action is not barred by any Statute of Limitations.

III. That the plaintiff is entitled to recover from the defendant the sum of $3,-520.52.

IV. That the Set-Off and Counterclaim of the defendant for the sum of $3,520.52 should be dismissed.

V. Let judgment be entered accordingly.

---

[1] In 1948 Revision, 28 U.S.C.A. §§ 1346, 2401, 2402.