**HIRSCH LUMBER COMPANY,**
Plaintiff-Appellant,

v.

**WEYERHAEUSER STEAMSHIP COMPANY, Defendant-Appellee.**

No. 338, Docket 23995.

United States Court of Appeals Second Circuit.

Argued April 12, 1956.

Decided June 1, 1956.

Max Ornstein, New York City, for plaintiff-appellant.

Dow & Symmers, New York City (William G. Symmers, Frederick Fish, William Warner, New York City, of counsel, on the brief), for defendant-appellee.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

This appeal raises two questions: First, whether bills of lading under which lumber was to be carried by sea from Olympia, Washington to Port Newark, New Jersey, could lawfully provide that freight was immediately due upon delivery of the lumber to the carrier even though the lumber was not delivered to point of destination because of a strike at Port Newark. The second question is whether there was evidence to sustain the jury's finding that the carrier's delivery of the lumber to Baltimore because of the strike was a reasonable diversion under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304, and the provisions of the bills of lading.

Hirsch Lumber Company was the purchaser of one bill of lading and the assignee of the purchasers of seven other bills of lading, all covering shipments from Olympia, Washington to Port Newark, New Jersey, on the Western Trader, a liberty ship under $50,000 per month time charter to the carrier, Weyerhaeuser Steamship Company. Hirsch sued for return of freight paid in the total of $33,827.32, with interest and other charges, on the ground that Weyerhaeuser had not earned the freight because it failed to deliver the lumber at Port Newark. In the alternative Hirsch sought the reasonable cost of transporting the lumber from Baltimore to Port Newark, plus handling and terminal charges, which allegedly totalled approximately $34,850.

The Western Trader arrived at New York Harbor on January 3, 1955 and completed discharging lumber not covered by Hirsch's bills of lading at Brooklyn on January 6. Her next port of discharge was to be Atlantic Terminals, Port Newark, and her final port was Independent Terminals, also at Port Newark.

Commencing January 3 a picket line had been established at Atlantic Terminals by striking lumber-handling employees who were members of Local 478 Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. L. At this time the steamship W. L. McCormick, owned and operated by Weyerhaeuser, was berthed at Atlantic Terminals, having arrived with a cargo

of lumber on January 1. When the McCormick was shifted to Bayway Terminals in Port Newark on January 4 a picket line prevented her unloading there. After the Western Trader had unloaded her Brooklyn cargo she anchored off Staten Island on January 6 and remained there until January 14. The strike continued until April 5, 1955.

Considerable evidence was introduced by Weyerhaeuser tending to show that there was good reason to conclude that the lumber could not have been discharged at Port Newark or elsewhere in the Port of New York. Various of defendant's employees testified that representatives of the union on strike had stated that they would establish a picket line at any place where any vessel with cargo consigned to Atlantic Terminals might berth. As already stated, pickets had followed Weyerhaeuser's McCormick to Bayway Terminals in Port Newark on January 4 and had thereby prevented her unloading there. Not all of the lumber covered by the bills of lading involved here was consigned to Atlantic Terminals, but there was evidence to show that the Western Trader was so loaded that the Atlantic Terminals lumber had to be discharged before any of the other lumber could be reached.

On January 6 Weyerhaeuser commenced an action against the officers of the striking union in the District Court for New Jersey. An application for an injunction against picketing any of Weyerhaeuser's vessels at Newark or in the Port of New York, heard on January 12 by order to show cause signed on January 7, was denied on the ground that the National Labor Relations Board had primary jurisdiction. Following this, on January 13, Weyerhaeuser filed a complaint with the Board.

Captain Lawrence Howard, a vicepresident and director of Weyerhaeuser, testified that he sought permission of the Port of New York Authority to berth the Western Trader at a public terminal pier in Port Newark, but that this was refused. This was corroborated by Captain Robert Schulze, general manager of the Marine Operations Division of the Port of New York Authority. Edward J. Carroll, general superintendent of the Nacirema Operating Company, who was a member of the Conference Committee of the New York Shipping Association, which represents the shipping companies in negotiating collective bargaining agreements with the International Longshoremen's Association, also testified for the defendant. He was handling the unloading of the McCormick and the Western Trader and he contacted various officials of the I. L. A. in an effort to get the ships unloaded. Each official with whom he talked advised him that the longshoremen would respect a picket line.

After the failure of all these attempts to find a means of unloading in Newark or the Port of New York Weyerhaeuser learned that labor in Baltimore would not honor pickets from Newark. Accordingly the Western Trader left New York on January 14 and steamed to Baltimore where she commenced discharging the lumber on January 15. The pickets did follow the Western Trader to Baltimore and established a picket line at the terminal there, but despite this the lumber was unloaded.

The plaintiff sought to show that part or all of the Western Trader's lumber could have been unloaded at the Independent Terminals in Port Newark or the Gowanus Terminals in Brooklyn. Thus Mr. Hall, president of the Independent Terminals testified that he was ready, willing and able to berth and unload the Western Trader. He qualified this, however, by stating that he would not have attempted to unload "hot cargo" consigned to the Atlantic Terminals. Mr. Garbutt, terminal manager of the Gowanus Terminals, testified that in his opinion the Western Trader could have been unloaded at his Terminals in Brooklyn.

The eight bills of lading all provided that the lumber was to be delivered at Port Newark, New Jersey and they all contained the word "Collect" next to the amount of the freight indicating that the freight was to be paid on delivery. They provided in Clause 11:

"Freight, whether prepaid or collect, becomes wholly due and belongs absolutely to Carrier as soon as the Goods are received by Carrier, and shall be deemed earned, and if prepaid shall not be returnable, and if collect shall be payable, ship and/or cargo lost or not lost."

They provided further in Clause 6 that in case of any event which in the judgment of the carrier or master is likely to make it unsafe or imprudent

"* * * for any reason * * to * * * discharge the cargo at the port of discharge, or to give rise to delay or difficulty in * * * discharging at * * * the port of discharge, the master, either with or without * * * attempting to * * * discharge the goods there * * * may * * * stop at such place as he or the Carrier may consider safe or advisable under the circumstances * * * and there discharge the cargo * * * and when so discharged the cargo shall be at the risk and expense of shippers and/or consignees or receivers, and delivery thereof by the Carrier shall be considered complete and the Carrier shall be freed from any further responsibility in respect thereof; * * * The forwarding of cargo from a port of distress or other place where there has been a forced interruption or abandonment of the voyage shall be at the expense of the shipper and consignee of the goods, * * *"

By Clause 1 the bills of lading incorporated the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315, which provides in § 1312 that a bill of lading which covers a carriage of goods between seaports of the United States may provide that it is subject to this Act. Section 1304(2) (j) provides that the carrier shall not be responsible for loss or damage resulting from "strikes * * or stoppage or restraint of labor from whatever cause, whether partial or general: * * *." The Act further provides in § 1304(4) that a reasonable deviation shall not be deemed a breach of the contract of carriage and that a deviation for the purpose of unloading cargo shall *prima facie* be regarded as unreasonable.

If these provisions of the bills of lading are lawful, the carrier may retain the entire freight if failure to deliver the lumber at Port Newark was reasonable under the circumstances, and if it was reasonable to have unloaded the lumber at Baltimore on January 15, 1955.

Judge Leibell ruled that the provisions of the bills of lading were valid and accordingly instructed the jury that Weyerhaeuser was entitled to the freight for the carriage of the lumber if it sustained the burden of showing that delivery of the lumber to Baltimore was reasonable because of the strike and the labor stoppage at Port Newark and the Port of New York. We agree with Judge Leibell that the provisions of the bills of lading are valid. That bills of lading may provide that freight is earned even though the cargo is not delivered to the designated port is well established. Alcoa Steamship Co. v. United States, 1949, 338 U.S. 421, 422, 70 S. Ct. 190, 94 L.Ed. 225; Allanwilde Transport Corp. v. Vacuum Oil Co., 1919, 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312; International Paper Company v. The Gracie D. Chambers, 1919, 248 U.S. 387, 39 S. Ct. 149, 63 L.Ed. 318; Standard Varnish Works v. The Bris, 1919, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321.

Under the Carriage of Goods by Sea Act a reasonable deviation to unload cargo does not subject the carrier to liability for any loss or damage resulting, although the carrier has the burden of showing that it was reasonable. 46 U. S.C.A. § 1304(4). If the carrier can show that the deviation was due to a strike or stoppage or restraint of labor, the same Act expressly provides that he shall not be responsible for resulting loss, 46 U.S.C.A. § 1304(2) (j). In Kroll v. Silver Line, Ltd., N.D.Cal.S.D.1953, 116 F.Supp. 443, where the bills of lading contained provisions similar to those herein question, the District Court held it reasonable to deliver cargo enroute from

Calcutta to Los Angeles, at Tacoma, Washington, the nearest open port to Los Angeles, which, with other ports, was closed by the general Maritime strike of 1948. The Court found it unnecessary to resort to the Carriage of Goods by Sea Act since there was no deviation; the contract expressly sanctioned an alternate place of delivery in the event of labor trouble. The libellants were denied recovery of their costs in transporting the cargo to Los Angeles from Tacoma.

A December 1955 decision of the Court of Appeals of England in G. H. Renton & Co., Ltd. v. Palmyra Trading Corporation of Panama reported in Weekly Law Reports for January 20, 1956, [1956] 2 W. L.R. 232, deals with a somewhat similar diversion of a shipment of timber from British Columbia to London and Hull under bills of lading providing that with respect to goods loaded in Canada the Water Carriage of Goods Act, 1936, of the Dominion of Canada [1] shall be effective. In that case the agreed facts were that the carrier unloaded the lumber at Hamburg, conceded to be the nearest convenient port if discharge at any port other than London and Hull was lawful, because it was impossible to discharge the cargo at London and Hull due to strikes and labor troubles. The bill of lading contained provisions as follows:

14(c) "Should it appear that * * * labour troubles * * * would prevent the vessel from * * entering the port of discharge or there discharging in the usual manner and leaving again, all of which safely and without delay, the master may discharge the cargo at the port of loading or any other safe and convenient port."

14(f) "The discharge of any cargo under the provisions of this clause shall be deemed due fulfillment of the contract."

The Court of Appeals held the carrier had made proper delivery under its contract and was not liable for any expenses or losses incurred by the shipper by reason of discharge of the lumber at Hamburg. Thus whether we rely on the Carriage of Goods by Sea Act or merely on paragraphs 6 and 11 of the bills of lading we must conclude that if the carrier acted reasonably in proceeding to Baltimore it is entitled to its freight.

■ Judge Leibell fairly and correctly left to the jury the reasonableness of Weyerhaeuser's discharge of the lumber at Baltimore. After summarizing the pertinent provisions of the bills of lading and the sections of the Act, including that which provided that a deviation to unload cargo was *prima facie* to be regarded as unreasonable, he charged that "the propriety of the deviation is a fact question of inherent reasonableness depending on all the surrounding circumstances." And after summarizing the evidence he charged:

"If you conclude that the carrier was justified in deciding that it could not make delivery in Port Newark or the Port of New York and that Baltimore was the nearest port at which the carrier could be reasonably sure of making delivery, then the deviation in the voyage of the Western Trader from New York to Baltimore was reasonable and proper, or you may so conclude."

And he again charged as to burden of proof that it was upon the defendant "to show that the deviation was reasonable

1. The Canadian Act of 1936, the British Act of 1924, and laws of other countries, like our own statute of 1936, 46 U.S.C.A. §§ 1300–1315, were all adopted following the Brussels Convention of 1924 and the adoption by many countries of the "Hague Rules." The purpose of these conventions and acts was to simplify and make uniform the provisions of ocean bills of lading and the rights of shippers and carriers. See Note, 23 Va.Law Rev. 590 (1937). See also 1 Benedict on Admiralty 291–92 (6th ed. 1940); 6 Benedict on Admiralty 154 et seq. (6th ed. 1941). Although our act covers only foreign commerce, it may be incorporated into domestic bills of lading as was done in the case at bar. 46 U.S.C.A. § 1312.

under all the circumstances * * * by a fair preponderance of the evidence." After the conclusion of the main charge, and at the plaintiff's request, this instruction as to burden of proof was repeated by the Court.

Thus, after a clear, careful and thorough charge from the Court, the jury found for the defendant. There was ample evidence to justify their verdict and the judgment is affirmed.